U.S. DISTRICT COURT – N.D. OF N.Y.

**FILED**

**Feb 1 - 2025**

John M. Domurad, Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____x

GLENN FEDERMAN

PLAINTIFF

**COMPLAINT**

v.

Case No.: _5:25-cv-152 (ECC/ML)_

NYSARC, INC.- JEFFERSON COUNTY CHAPTER

DEFENDANT

_____x

**PRELIMINARY STATEMENT**

1.  Plaintiff, Glenn Federman, brings this action against Defendant NYSARC, INC.-
    JEFFERSON COUNTY CHAPTER for violations of:
    a.  The Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq.;
    b.  Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.;
    c.  The Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq.; and
    d.  The New York State Human Rights Law (NYSHRL), N.Y. Exec. Law § 290 et seq.

2.  Plaintiff alleges that Defendant engaged in wrongful termination, discrimination,
    harassment, retaliation, and failure to provide reasonable accommodations, culminating
    in Plaintiff's retaliatory termination 11 days before the end of his probationary period and
    2 days after raising critical patient care concerns.

3.  Plaintiff was issued a Notice of Right to Sue by the Equal Employment Opportunity
    Commission (EEOC) in January 2, 2025, after Defendant prematurely terminated
    Plaintiff without prior performance reviews, proper accommodations, or due process, and
    following a flawed administrative process where the EEOC failed to consider Plaintiff's
    full rebuttal to Defendant's position statement.

4.  On December 13, 2023, the day before Plaintiff was terminated, he developed and
    implemented a CPAP training session for the benefit of the Persons We Support (PWS)
    and LPN, DSP and Residence staff. This training was conducted outside of normal
    working hours, demonstrating Plaintiff's dedication and commitment to his role.

1

5. During the termination meeting on December 14, 2023, Defendant's Nursing Supervisor informed Plaintiff that the CPAP training materials he developed would continue to be used by the nursing department, despite Plaintiff's abrupt dismissal. This statement further underscores the pretextual nature of Plaintiff's termination.

6. Plaintiff includes key exhibits, including the CPAP training materials (Exhibit A), the EEOC Right to Sue Letter (Exhibit C), and internal communications, to substantiate the allegations and procedural errors by Defendant and the EEOC.

7. Plaintiff alleges that Defendant's engagement  in discrimination and harassment was predispositioned by Plaintiff's 5 years of civil litigation against a local municipality and school district where NYSARC, INC.- JEFFERSON COUNTY CHAPTER is located . The school district encompasses the homes  where the Director of Nursing Services and other prominent personnel reside; where several  IRA's are located, where a number of Persons We Support (PWS) have families, and the impact the school district has on programs within the ARC's outreach. Plaintiff's litigation includes  EF2019-00001146, EF2021-00002391,  2019-cv-0708   2023-cv-1148 2025-cv-0064.

## JURISDICTION AND VENUE

8. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) because Plaintiff's claims arise under federal laws, including the ADA, Title VII, and ADEA.

9. This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

10. Venue is proper under 28 U.S.C. § 1391(b) because the events giving rise to the claims occurred in this judicial district, and Defendant conducts substantial business in this district.

## PARTIES

11. Plaintiff: Glenn Federman, an individual residing in Adams, NY, is a qualified individual with disabilities as defined under the ADA. Plaintiff was employed by Defendant as a registered nurse.

12. Defendant: Nysarc, Inc.- Jefferson County Chapter, a corporation operating in Watertown, NY employs more than 15 employees and is subject to the ADA, Title VII,

2

ADEA, and NYSHRL. Defendant engages in interstate commerce and provides services within this judicial district.

## FACTUAL ALLEGATIONS

A. Background and Hiring Process

13.    Plaintiff was hired on or about September 27, 2023 as a registered nurse. During the hiring process, Plaintiff disclosed his medical conditions, including severe autoimmune inflammatory arthritis, congestive heart failure (CHF), and bilateral joint replacement surgeries. (Exhibit A)

14.    Defendant acknowledged Plaintiff's limitations and assured him that reasonable accommodations, including remote work and ergonomic equipment, would be provided as needed to support his role.

15.    The job description for Plaintiff's role did not include typing speed or performance as an essential duty, and no testing or discussion of typing skills occurred during the interview process.

B. Dedication to Role and CPAP Training

16.    On December 13, 2023, Plaintiff developed and implemented a comprehensive CPAP training session at the residence for PWS. This training:

- Included instructional handouts and materials created by Plaintiff.
- Was conducted outside of Plaintiff's regular working hours.
- Demonstrated Plaintiff's commitment to the safety and well-being of PWS and to supporting the nursing staff.

17.    During Plaintiff's termination meeting the following day, the Nursing Supervisor stated that the CPAP training materials would continue to be used by the nursing department, highlighting Plaintiff's significant contributions despite the abrupt dismissal. (See Exhibit F: CPAP Training Materials).

C. Retaliation and Wrongful Termination During Probation

18.    On December 12, 2023, Plaintiff investigated and reported serious concerns about a PWS experiencing significant weight loss which was brought to Plaintiff's attention via an email from the PWS's family member who resided out of state. Plaintiff also investigated and reported medication shortages.

19.    Plaintiff documented his findings in THERAP and communicated them in person to the Residence Manager and Nursing Supervisor via email.

20.   Hours later, the Nursing Supervisor authored a critical email about Plaintiff, which was later cited as the basis for Plaintiff's termination. (Exhibit I)

21.   On December 14, 2023, Plaintiff was summoned to an abrupt termination meeting. Plaintiff was:
- Called into the office unexpectedly while working remotely.
- Presented with a termination letter without prior warning or discussion of performance issues.
- Not allowed to respond to or discuss the allegations against him.

22.   Defendant's decision to terminate Plaintiff just 11 days before the end of his probationary period, following protected activity, constitutes retaliation and wrongful termination under federal and state law.

D. Hostile Work Environment and Prior Lawsuits

23.   Plaintiff's prior lawsuits filed in 2019 and subsequent years against the town, school district, and other entities involved individuals closely connected to Defendant, including female management personnel, employees, and residences (IRAs) for PWS.

24.   Plaintiff was subjected to discriminatory and retaliatory conduct designed to isolate and humiliate him, including:
- Being referred to as "the infamous Glenn Federman," stigmatizing him due to his lawsuits.
- Mocking his physical limitations and alleged slow typing speed.

25.   Defendant failed to address or rectify these incidents, perpetuating a hostile and toxic work environment.

E. Procedural Failures by the EEOC

26.   Plaintiff filed a charge with the EEOC alleging discrimination, retaliation, and wrongful termination.

27.   The EEOC granted Plaintiff a two-week written extension on December 16, 2023 via email to file a rebuttal to Defendant's position statement. (Exhibit H)

28.   Despite this extension, the EEOC prematurely closed the case on December 30, 2023, relying on an unauthorized verbal rebuttal instead of Plaintiff's prepared 11-page written response.

29.   Plaintiff received a Notice of Right to Sue from the EEOC on January 2, 2025. (See Exhibit G: EEOC Right to Sue Letter)

4

30.    Plaintiff obtained the complete EEOC file through a FOIL request, which demonstrates procedural errors, including:

- Failure to consider Plaintiff's written rebuttal.
- Omissions in the investigative process.
- Reliance on incomplete and biased evidence from Defendant.

**CAUSES OF ACTION**

**COUNT I: Disability Discrimination (ADA)**

31.    Defendant failed to provide reasonable accommodations and engaged in discriminatory practices, in violation of the ADA, 42 U.S.C. § 12112(b)(5).

**COUNT II: Retaliation (ADA and Title VII)**

32.    Defendant retaliated against Plaintiff for engaging in protected activities, in violation of the ADA and Title VII.

**COUNT III: Hostile Work Environment (ADA and Title VII)**

33.    Defendant created and perpetuated a hostile work environment based on Plaintiff's disabilities, prior lawsuits, and perceived limitations, in violation of the ADA and Title VII.

**COUNT IV: Wrongful Termination During Probation**

34.    Defendant terminated Plaintiff 11 days before the end of his probationary period and 2 days after he exposed serious patient safety issues, constituting wrongful termination. (Exhibit J)

**COUNT V: Procedural Failures by the EEOC**

35.    Defendant relied on procedural errors by the EEOC to undermine Plaintiff's ability to fully pursue his claims, constituting a failure of administrative due process.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

1. Declare Defendant's actions unlawful under the ADA, Title VII, ADEA, and NYSHRL.

2. Award compensatory damages, including back pay, front pay, and damages for emotional distress.

3. Award punitive damages to deter future discriminatory conduct.

4. Grant injunctive relief requiring Defendant to implement anti-discrimination policies and training.

5. Order Defendant to provide all requested employment-related records, including THERAP data and SCR clearance documentation.

6. Award Plaintiff reasonable attorneys' fees, costs, and disbursements.

7. Grant such other relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all claims triable by jury.

Attachments:

Exhibit A: Photos of Plaintiff's severely arthritic hands and bilateral index finger joint replacement

Exhibit B: Laptop Dell 5520 With Very Small Keyboard Received September 29, 2024 from IT

Exhibit C: Defendant Failed To Provide Claimant Large Keyboard Accommodation

Exhibit D: Female Rn's Received Preferential Treatment For Remote Computer Access

Exhibit E: Example Of Complainant's 18 Weekly Notes For Pws Entered In Therap On 12/8/23 With Actual Pws Information Omitted

Exhibit F: CPAP Training Materials Developed and Implemented by Plaintiff

Exhibit G: EEOC Right to Sue Letter

Exhibit H: Respondents (Agency) Position Statement

Exhibit I: Complainant's Written Rebuttal to Respondents Position Statement

Exhibit J: December 12, 2023, Email by Nursing Supervisor.

Exhibit K: ARC Termination Letter

Exhibit L: Emails with rebuttal response and formal reconsideration to EEOC Inspector Newhard

Exhibit M: Formal reconsideration to EEOC Director Kielt

Exhibit N: Complainant's Resume & Job Application

Dated: January 31, 2025

Respectfully submitted,

Glenn Federman Pro Se Plaintiff
315 586 3382

# Exhibit A



*Left Index Finger*



*Right Index Finger*



*Right Index Finger*



*Left Hand*



*Right Hand*

# Exhibit B

**Laptop Dell 5520**
**Received September 29, 2024 from IT**
*Search on screen is for COVID Symptoms*

## NOTICE THE EXTREMELY SMALL KEYBOARD



# Exhibit C

## RESPONDENT FAILED TO PROVIDE CLAIMANT LARGE KEYBOARD ACCOMMODATION

- ON OR ABOUT OCTOBER 9, 2023 CLAIMANT WAS INITIALLY APPROVED BY DIRECTOR OF NURSING SERVICES FOR ACCOMMODATION OF A LARGER KEYBOARD BUT NEVER RECEIVED THE LARGER KEYBOARD

- AFTER RECEIVING LAPTOP COMPUTER ON SEPTEMBER 29, 2023, CLAIMANT PERSONALLY MET WITH DIRECTOR OF NURSING SERVICES AT HER OFFICE AND REQUESTED A LARGER STANDARD KEYBOARD TO USE WITH THE LAPTOP DUE TO CLAIMANT'S LARGE ARTHRITIC HANDS.

- DIRECTOR OF NURSING SERVICES LM STATED HER APPROVAL FOR CLAIMANT REQUEST AND STATED SHE WOULD CONTACT IT SUPERVISION TO ARRANGE FOR THE LARGER KEYBOARD.

- DESPITE A NUMBER OF FOLLOWUP REQUESTS TO DIRECTOR OF NURSING SERVICES A LARGER KEYBOARD WAS NOT PROVIDED TO CLAIMANT

# Exhibit D

## FEMALE RN'S RECEIVED PREFERENTIAL TREATMENT FOR REMOTE COMPUTER ACCESS

- RESPONDENT FAILED TO PROVIDE CLAIMANT THE SAME REMOTE COMPUTER ACCESS THAT FEMALE RN'S RECEIVED WHEN THEIR WORK LAPTOP COMPUTER WAS PROVIDED

- PURSUANT TO NURSING SUPERVISOR OCTOBER 19, 2023 TEXT MESSAGE ALL NEW RN's WERE IMMEDIATELY PROVIDED WITH REMOTE COMPUTER ACCESS WHEN THEY RECEIVED THEIR COMPUTER AND SHE THINKS SE MESSED UP THE IT REQUEST WHEN CLAIMANT STARTED. SHE THOUGHT SHE REQUESTED REMOTE ACCESS AND THAT ALL RNS HAVE IT…



9

- CLAIMANT WAS NOT PROVIDED WITH REMOTE COMPUTER ACCESS UNTIL OCTOBER 20, 2023 WHICH WAS ALMOST A MONTH AFTER RECEIVING THE COMPUTER

- CLAIMANTS HEALTH WAS ONE REASON WORKING REMOTELY WAS IMPORTANT FOR CLAIMANT DUE TO ASSOCIATED FLUID BUILDUP IN LEGS WHICH OCCURRED WHILE CLAIMANT WAS SITTING AND WORKING AT THE NURSES STATION WITH LOW DESKTOP.

- IF CLAIMANT WAS IMMEDIATELY PROVIDED REMOTE ACCESS LIKE ALL OTHER RN'S, CLAIMANT WOULD NOT HAVE HAD EXCESS FLUID BUILDUP IN LEGS WHICH REQUIRED MULTIPLE TRIPS TO THE BATHROOM TO RELEASE EXCESS FLUID.
- DIRECTOR OF NURSING SERVICES AND NURSING SUPERVISOR FAILED TO ACCOMMODATE DESPITE KNOWING CLAIMANTS HEALTH ISSUES WHICH WERE DISCUSSED DURING THE INTERVIEW.
- DIRECTOR OF NURSING SERVICES AND NURSING SUPERVISOR FAILED TO ACCOMMODATE BY PROVIDING IMMEDIATE REMOTE ACCESS LIKE ALL FEMALE RNS HAD. THIS FAILURE DELIBERATELY PREVENTED CLAIMANT FROM WORKING REMOTELY FOR ALMOST A MONTH, WHICH CAUSED UNNECESSARY HEALTH COMPLICATIONS.

- CLAIMANT WAS INTENTIONALLY DENIED THE OPPORTUNITY TO WORK REMOTELY AND TREATED DIFFERENTLY THAN ALL OTHER RN's WHO WERE FEMALE

# Exhibit E

**EXAMPLE OF CLAIMANT'S 18 WEEKLY NOTES FOR PWS ENTERED IN THERAP ON 12/8/23 WITH ACTUAL PWS INFORMATION OMITTED**

Reviewed Notes, MAR and logs from *Date -Date PWS* has been doing well with new equipment. Lab work on *Date* results imputed. Weight consistent with range from 199.2 - 199.5. Last BM on *Date*. Total daily fluid intake range from 1700 ml to 1960 ml.
No acute medical concerns at this time. Documentation complete.
Next appt: Date Time Location
Future PCP appt: Date Time Location

# EXHIBIT F

# CPAP  Care Plan and Training Developed and Implemented by Claimant for CR7



CPAP TRAINING FOR CR7 WITH SIGN IN SHEET

Apnea is when a person stops breathing repeatedly during sleep. Breathing stops because the airway collapses and prevents air from getting into the lungs. Sleep patterns are disrupted, resulting in excessive sleepiness or fatigue during the day. People with sleep apnea are at  increased risk for:  High blood pressure, stroke, decreased quality of life, heart disease and heart attack.

Obstructive sleep apnea is the most common sleep-related breathing disorder. People with obstructive sleep apnea repeatedly stop and start breathing while they sleep.

Obstructive sleep apnea occurs when the throat muscles relax and block the airway. This happens off and on many times during sleep. A sign of obstructive sleep apnea is snoring. One treatment for obstructive sleep apnea is a device that uses positive pressure to keep the airway open during sleep.

Episodes of decreased breathing usually last 20 to 40 seconds. People with OSA rarely are aware of having any difficulty breathing, even upon awakening. In adults, OSA is most typically related to obesity. The most common symptoms are loud snoring, unexplained daytime sleepiness, and restless sleep. Other symptoms can include morning headaches, insomnia, mood changes, forgetfulness, unexplained weight gain, and heavy night sweats. The most common and effective intervention used is a CPAP (continuous positive airway pressure). This is a mask that covers the nose, mouth, or both, and applies extra pressure, holding open the relaxed muscles, keeping the airway open.

## CPAP TRAINING SIGN IN SHEET FOR CR7

### Goal(s)

Staff will understand diagnosis and treatment interventions.

Staff will:Demonstrate understanding of CPAP machine use and maintenance.

Staff will monitor and report changes as listed below.

Observe the person for any of the following:

- Increased sleepiness or lethargy during the daytime hours
- new complaints of headaches in the mornings
- changes in breathing when sleeping, especially snoring or periods of not breathing
- Changes in sleep patterns
- Increases in blood pressure from baseline
- Increase irritability

Document any of the above in t logs and notify nursing of any problems

I received CPAP training on _____ and acknowledge understanding of the information presented by my signature below.

_____

_____

Training provided by _____

Glenn Federman RN              Date_____

12

EXHIBIT G

 **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**Buffalo Local Office**
300 Pearl St, Suite 450
Buffalo, NY 14202
(716) 431-5007
Website: www.eeoc.gov

# DETERMINATION AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Date Issued: 01/02/2025

**To:** Glenn Federman
17254 Miller Rd
Adams, NY 13605

Charge No: 525-2024-01881

EEOC Representative and email: Federal Investigator, Kimberly Newhard

kimberly.newhard@eeoc.gov

## DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

## NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission,

Maureen Kielt                    01/02/2025

Maureen Kielt
Local Office Director

Cc:

The Arc Jefferson St. Lawrence
380 Gaffney Dr
Watertown, NY 13601

Alexandra L. Robins
Kaufman Dolowich LLP
245 Main St, Ste 330
White Plains, New York 10601

Please retain this notice for your records.

# KAUFMAN|DOLOWICH

*Exhibit H*

Kaufman Dolowich LLP
245 Main Street, Suite 330
White Plains, NY 10601

Telephone: 914.470.0001
Facsimile: 914.470.0009

www.kaufmandolowich.com

**Alexandra L. Robins**
srobins@kaufmandolowich.com

October 28, 2024

**_Via Email_**
Kimberly Newhard
Equal Opportunity Employment Commission
Kimberly.Newhard@eeoc.gov

> Re:    *Glenn Federman v. NYSARC, Inc. - Jefferson County Chapter,*
>        *Charge 525-2024-01881*

Dear Equal Opportunity Employment Commission:

Our office represents The Arc Jefferson-St. Lawrence ("Respondent" or "Agency") with regard to the above-referenced Charge of Discrimination ("Charge") filed by Glenn Federman ("Complainant") with the Equal Opportunity Employment Commission ("EEOC"). Complainant alleges discrimination in violation of Title VII of the Civil Rights Act of 1964 based upon sex (male), The Americans with Disabilities Act (denial of accommodation) and the Age Discrimination in Employment Act ("ADEA") (age 69). The Agency denies the allegations and responds as follows.

- *Parties & Relevant Background*

The Agency is a not-for-profit organization dedicated to supporting people with developmental disabilities through residential and direct care, personal skills development, employment and vocational programs, social activities, and volunteerism, community integration, therapeutic intervention and residential living. The Agency maintains a robust handbook containing, as relevant here, an anti-discrimination policy. **Exhibit A.**

Complainant was hired on or about September 27, 2023 as a Registered Nurse ("RN") caring for people the Agency supports. He reported to the Supervisor of Nursing Services. Complainant earned $29.36 per hour and worked approximately 40 hours per week. As an RN, Complainant's main job function was to provide medical direction and support to License Practical Nurses ("LPNs") and Direct Support Professionals ("DSP") in the care of the people the Agency supports. **Exhibit B.** Complainant was terminated prior to the end of his three-month probationary period on or about December 14, 2023. **Exhibit C.**

NY | NJ | CT | PA | FL | IL | LA | TX | CA

As stated on the Job Description, a Registered Nurse was expected to perform the following functions:

**ESSENTIAL FUNCTIONS** — *Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.*

1. Provide medical oversight to all people we support and instruction to Support Staff.
2. Prepare annual and semi-annual reports on assigned person supported; attend and actively participate in team meetings.
3. Maintains medical records for assigned people we support. Information may include but is not limited to Nurse's Notes (T-logs), MARs, treatment sheets, PRN Sheets, allergies, diagnostic testing records, immunizations, etc.
4. Complete random skill assessments of Licensed Practical Nurse of assigned site. Document training and submit to Staff Development.
5. Conduct random inspections of documentation pertaining to medication administration and observation of staff administering medication during unannounced visits. Annual and remedial observations will be completed as scheduled.
6. Complete written protocols to provide Direct Support Professionals with step-by-step instructions for care regarding acute and chronic conditions, communicable diseases and complications/exacerbations. Provide training to all Support Staff regarding Protocols/Plans of Nursing Care. Randomly evaluate support staff for compliance of protocols.
7. Ensure documentation related to nursing services and/or on-going medical concerns is completed, reviewed and concerns addressed. Address any significant changes in the wellbeing of the people we support to include in their weight or appetite. Enter pertinent medical information in Therap which will keep all Team members informed.
8. Ensure all medication changes are addressed. Maintain current medication and treatment sheets for all people assigned. Maintain current listing of allergies and special needs (i.e. special diets, food sensitivities, photosensitivity and tetanus updates).
9. In conjunction with the support staff schedule medical appointments as needed and/or required by regulation. Attend appointments where significant medical issues will be addressed.
10. Review on-going nursing notes (I-logs) for noted concerns on not less than a weekly basis and as indicated. Ensure that day to day Nurses' notes are appropriately completed by support staff. Provide training as needed.
11. Maintain active participation on agency committees assigned.

**Exhibit D.**

According to Complainant's resume, he obtained a bachelor's degree in Music in 1984; a bachelor's degree in nuclear technology in 1994; a PhD in education in 2004; and an associate's degree in nursing in 2011. Also according to his resume, Complainant spent most of his working life at a nuclear power corporation, and then the last few years as a "private home caregiver." **Exhibit B.**

Although Complainant was encouraging and positive with the nursing staff, it became clear rather quickly that Complainant did not have the necessary clinical experience and could not provide proper oversight to LPNs and DSPs in the care of people supported. On Tuesday, December 12, 2023, the Director of Nursing services reported as follows:

2

From: Nickel, Joanna C. <jcnickel@thearcjslc.org>
Sent: Tuesday, December 12, 2023 8:14:01 PM
To: McGrath, Laurie L <llmcgrath@thearcjslc.org>; Peck, Victoria M. <vmpeck@thearcjslc.org>
Subject: GF request for termination

I know I've talked with you both throughout the day about the concerns with Glenn Federman RN. Laurie and I agreed that termination is probably the best course of action here. It took me some time to properly articulate the concerns. Here's a summary -

- Today staff called me before noon to report they had received a medication change for a PWS. They were on a 30 mg tab that was unavailable from the pharmacy but had received a 20 mg tab and a 10 mg to substitute. This has been an ongoing issue for several months. Glenn sent a long email the previous day about exploring options at different pharmacies and such. Laurie said she would discuss this with him when she returned. I advised the staff to send the paperwork to me and I would forward it to Glenn so he could update the MAR. The long and the short of it is, he went to the house to discuss it with the staff. He didn't sign in or out of PayCom to travel fm home to the site. He also did not sign in and out of the visitors log. He updated the MAR at 1045A but just duplicated the 30 mg tab. I contacted him to ask about it and he told me it was a tapering dose. I contacted the RM Lisa Jarvis and this was incorrect. It was supposed to be a 20 mg and a 10 mg tab. I talked with him about it around 3P. He called me at 430P to ask about how to fix it on the MAR. At the present time the MAR is still not

corrected. I advised the staff to do paper documentation, so the medication could be given. This very simple task ended up being an all day ordeal and is still not corrected.
- Glenn does not accept guidance and direction from other staff including me. I had directed him to attend 2 meetings at the site he is assigned to so he could meet the teams and visit the site. He chose to visit another PWS in the hospital. The meetings seemed more important since they only occur 2x a year. He also had a lengthy discussion with Arlandy when she was helping him update a plan of nursing service. Several of the staff that were present in the office that day stated it got kind of heated.
- Computer skills are severely lacking which leads to simple tasks taking an extended period of time. I don't believe he can complete his assigned duties in 40 hrs per wk. He has clocked overtime without approval since he started but it has been to the tune of 5 or more hours per wk for 3 of the last 4 wks.
- No established routine after being here nearly 3 months. Time mgmt skills are lacking.
  - He has not completed weekly visits and apparently did not know they were required even though I went over this on day 1 and nearly every week since he's been here.
  - Monthly MAR review has only been done on 2 PWS since he started. October MAR reviews were not done. I showed him how to do this.
  - Has not checked his emails. This resulted in him missing several meetings that he was needed at. One of the RNs showed him how to check the emails after missing a CSP meeting and at that time he had 117 emails. Apparently this did not improve because another RN showed him again and there were over 200 emails that were not read.
- Does not help answer phones or pass medications when in the office
- Clinical skills may also be lacking
  - COVID tested a PWS. After it was negative, he sent them on their way without advising further or having the PWS wear a mask
  - One of the RNs guided him into passing meds to ease him into it and he failed to wash his hands and handled the medications without gloves. Not a good role model for showing others how to do this.
- Disappears throughout the day. Sometimes for more than 40 minutes at a time.
- Takes personal calls in the office on speaker phone and disrupts the work environment

I do have to say he is generally pleasant and always says what a good thing we do here. He compliments the nursing staff on doing a good job often. But I don't think he is a good fit for the position. Thanks for helping us out with this. If you need anything further from me, let me know.

Joanna Nickel RN
Supervisor of Nursing Services

**Exhibit E**.

Ms. Nichol then followed with an email stating: "I forgot to include it in the email but one of the emails he missed was from a family member and Guardian like 10 days ago with concerns about a PWS's weight. They ended up calling the office because they didn't get a response. Michele fielded it and talked to Glenn about it." **Exhibit F**.

At his termination meeting, Complainant admitted that he was struggling with the technology the Agency used, and for the first time, told HR that he was also struggling with his own health issues, specifically with regards to getting to and from work every day. Because Complainant did not have the clinical training or experience necessary to perform the essential functions of the job, no accommodations were explored. Prior to the termination meeting, Complainant had never made a request for accommodation, only once asking to work remotely for the stated reason that the nurses station was "very crowded" and at home he had "more room" and could be "more productive and comfortable." This request was granted. **Exhibit G**. In any case, remote work was not the issue, but rather, Complainant's lack of clinical training, skills, knowledge of protocols and use of basic record keeping systems.

At the termination meeting, Complainant stated that he loved the Agency and what they do and would "only say great things as he moves forward."

- *Legal Standard*

In order to state a claim for sex discrimination under Title VII, a complainant must "plausibly allege that (1) the employer took adverse action against him and (2) his race, color, religion, sex, or national origin was a motivating factor in the employment decision." *Farmer v. Shake Shack Enterprises, LLC*, 473 F.Supp.3d 309, 324 (S.D.N.Y. 2020). An employee may do this by "alleging facts that directly show discrimination facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." *Id.* In order to state a claim for age discrimination under the ADEA, a complainant must show "(1) that she was within the protected group (more than forty years old); (2) that she was qualified for the position; (3) that she experienced adverse employment action; and (4) that such action occurred under circumstances giving rise to an inference of discrimination." *Gorzynski v. Jet Blue Airways Corp.*, 596 F.3d 93, 107 (2d Cir. 2010).

Here, the Charge states only that Complainant is 69 year old male, but does not set forth any facts or other information concerning why he is alleging sex and age discrimination. In fact, the Charge, which also establishes that Complainant was hired less than three months before his termination, tends to suggest that sex and age were not factors in the decision to terminate him, since he was clearly a 69 year-old male when he was recently hired. And, "[b]eing in the protected class when hired undermines any inference of age discrimination." *Baguer v. Spanish Broad. Sys.*,

4

*Inc.*, No. 04–CV–8393, 2010 WL 2813632, at *14 (S.D.N.Y. July 12, 2010), aff'd, 423 Fed.Appx. 102 (2d Cir.2011); see also *Mathews v. Huntington*, 499 F.Supp.2d 258, 267 (E.D.N.Y.2007) ("The inference of discrimination is further weakened by the fact that plaintiff, who was sixty-one years old at the time of his hiring, was well within the protected class when first hired.").

As for Plaintiff's claim under the ADA, that law requires covered employers to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability[.]" 42 U.S.C. § 12112(b)(5)(A). Unless the employer can demonstrate that an accommodation would impose on its operations undue hardship, the denial of a reasonable accommodation constitutes prohibited discrimination. See 42 U.S.C. §§ 12112(a) and (b)(5)(A); 29 U.S.C. § 794(d). The "on the basis of" language in the ADA imposes a "but-for" standard of causation. *Natofsky v. City of New York*, 921 F.3d 337, 349 (2d Cir. 2019).

Here, Complainant alleges that in November 2023, he requested a reasonable accommodation, which was denied. However, Respondent has no knowledge of Complainant seeking a reasonable accommodation for a disability. Complainant once requested to work from home because he found the nurses station to be crowded, and would be more productive and comfortable at home. He did not cite that the request was a necessary accommodation for his disability, and even if he had, his request to work from home was granted. Complainant did not mention that he was having trouble getting to and from work because of health problems until his termination meeting on November, 2023. Accordingly, any request for accommodation was not, by definition, related to Complainant's termination, since the decision to terminate him was made prior to his request for accommodation. But even if Complainant had made a request for a reasonable accommodation for a disability prior to the decision to terminate him, it would not have created a legal obligation recognized by the ADA, since there is no accommodation that would have allowed Complainant to perform the essential functions of his position, seeing as he did not having the training and experience necessary for the position in the first place.

- **Conclusion**

For these reasons, Respondent respectfully submits that the DHR should find no probable to believe that any unlawful discrimination occurred, and dismiss the Complaint.

Respectfully,

Alexandra L. Robins

C:    Siobhan Healy, Esq.

Exhibit I

EQUAL OPPORTUNITY EMPLOYMENT COMMISSION
GLENN FEDERMAN

                         Complainant Pro Se        **COMPLAINANT REBUTTAL
                                                   RESPONSE TO
                                                   RESPONDENT'S (AGENCY'S)
                                                   EEOC POSITION STATEMENT**
                                                   Charge 525-2024-01881
                v.

NYSARC, INC.- JEFFERSON COUNTY CHAPTER
                         Respondent (Agency)

_____

**PRELIMINARY STATEMENT**

The Complainant's termination was wrongful, retaliatory, and discriminatory, rooted in the Agency's systemic disregard for its legal obligations to ensure an equitable, supportive, and harassment-free workplace.

The Complainant's wrongful termination occurred 2 days after Complainant's investigation exposed a significant PWS weight-loss issue and raised concerns about the ongoing long term unavailable medication from the pharmacy and 11 days before Complainant's probationary period.

**This rebuttal addresses the misrepresentations, omissions, and discriminatory conduct outlined in the Agency's Position Statement. The Complainant provides substantial evidence demonstrating:**

1. Failure to provide reasonable accommodations in violation of the Americans with Disabilities Act (ADA).

2. Fostering a hostile work environment through discriminatory and retaliatory practices.

3. Retaliation for protected activity, including suppression of an investigation into significant weight loss in a Person We Support (PWS) .

4. Misrepresentation of qualifications as a pretext for termination.

5. Workload manipulation as a pretext for termination

6. Discrimination based on age and gender under the New York State Human Rights Law (NYSHRL) and federal law .

7. Failure to provide accommodations or training for alleged typing slowness

8. Failure to conduct a RN performance review with the Complainant.

1

9.  Nepotism was the method the Agency used to recruit Claimant's replacement.

10. Failure to provide Complainant the Nursing Supervisor's 12/14/23 email at the termination meeting which was the actual alleged basis for termination and not Policy# 315 - No Fault Termination that was stated in the meeting.

11.  The Complainant's allegations are substantiated by substantial evidence of systemic failures. Complainant's experience highlights the Agency's systemic failure to provide reasonable accommodations, foster a respectful workplace, and comply with anti-discrimination laws.

## I. FAILURE TO PROVIDE REASONABLE ACCOMMODATIONS

During the nursing interview, the Agency acknowledged that the Complainant has two manageable disabilities under the ADA: severe autoimmune inflammatory erosive osteoarthritis in his hands (requiring recent surgery) and severe leg swelling due to Congestive Heart Failure (CHF).

The Complainant was informed that RNs can work remotely several days a week. However, on September 29, 2023, he received a small laptop to use at a low countertop desk at the nurses station, which aggravated his leg swelling. Additionally, the small laptop keyboard posed significant challenges for him due to his arthritic hands, and he found it difficult to use the small desk phone system. He opted to use his cell phone instead, following advice from other RNs. (Exhibit B)

A. Standard-Sized Keyboard

On or about October 11, 2023, the Complainant verbally requested a standard-sized keyboard from the  Director Of Nursing Services at her office to accommodate his arthritic hands, affected by severe autoimmune inflammatory arthritis and bilateral index finger PIP joint replacement surgery. (Exhibit A) Despite immediate verbal approval from the Director Of Nursing Services, this accommodation was never provided, violating the ADA's mandate to provide reasonable accommodations unless undue hardship is demonstrated (McMillan v. City of New York, 711 F.3d 120 (2d Cir. 2013)).

B. Remote Work Access

The Complainant also requested remote work access to alleviate leg swelling caused by prolonged sitting, a condition exacerbated by Congestive Heart Failure (CHF). Although remote work was purportedly available for all RNs, the Complainant faced significant delays in receiving access and was granted only limited opportunities thereafter. Meanwhile, younger female RNs received immediate and consistent remote access, further highlighting disparate treatment. (Exhibit D)

C. Unequal Remote Access Work Opportunities

Even after gaining remote access, the Complainant was not allowed the same flexibility as other RNs, who routinely worked remotely to accommodate personal needs or secondary jobs. RN Nora – in a discussion at the nurses' station – stated how easy it was to work at the company, with freedom to work whatever hours they wanted. Despite being denied such flexibility, Complainant was targeted with excessive scrutiny and harassment

D. Disparate Treatment Regarding Remote Work

Text messages from the Nursing Supervisor, dated on or about October 18, 202 confirm that all registered nurses (RNs) were granted remote access immediately upon onboarding—except for Complainant. This clear instance of unequal treatment highlights the Respondent's failure to provide equitable accommodations. The delayed implementation of Complainant's requested accommodations, despite his documented need and verbal assurances from management, further exacerbates the discriminatory nature of these actions.

Such disparate treatment and unwarranted delays in providing reasonable accommodations are actionable under the **Americans with Disabilities Act (ADA)** as established in *Staron v. McDonald's Corp.*, 51 F.3d 353 (2d Cir. 1995), which emphasizes that employers are required to provide reasonable accommodations to qualified individuals with disabilities unless doing so imposes an undue hardship. Respondent's failure to act promptly and equitably violated Complainant's rights and contributed to a hostile and discriminatory work environment.

E. Spiteful Remote Access Denial

On October 19, 2023, Complainant attempted to log in remotely, hoping to improve his productivity. The Nursing Supervisor admitted failure to provide Complainant the same immediate remote access when he initially received his computer as confirmed by her text messages, reflecting deliberate discrimination. As a result the Complainant was not permitted to work remotely until October 20, 2023, as the Nursing Manager texted him to take the day off and make it a 3 day weekend. These 4 days off negatively affected Complainants desired work output which was undeniably used against him in the form of termination by Nursing Management.  (Exhibit D)

## II. FAILED TO PROVIDE TRAINING OR ACCOMMODATIONS FOR ALLEGED TYPING PERFORMANCE

The Agency frequently criticized the Complainant for alleged slowness in typing, yet failed to provide any training or accommodations to address the issue.

A. Lack of Standardized Training

3

Upon hiring, the Complainant was not provided with any standardized training on essential RN functions, including typing or data entry. Despite the variability in how RNs completed written documentation, the Complainant was singled out and chastised for his performance.

B. Refusal to Provide Typing Training or Accommodations

Despite raising concerns about his physical limitations and the ergonomic challenges of the workstation, the Agency:

1. Failed to offer typing training or skill development programs.

2. Denied ergonomic accommodations, such as a standard-sized keyboard, that would have supported the Complainant's ability to type more efficiently.

3. Refused to engage in an interactive process under the ADA to address typing concerns.

Instead, the Agency allowed younger female RNs to mock and humiliate the Complainant about his typing speed, fostering a hostile and discriminatory work environment.

C. Lack of Performance Reviews

The Agency failed to provide any written performance reviews to the Complainant throughout his employment  including at termination meeting. These reviews are critical to addressing and improving any alleged deficiencies in job performance. The absence of such documentation:

1. Deprived the Complainant of an opportunity to address concerns proactively.

2. Reflects a lack of transparency and accountability by the Agency.

3. Highlights the pretextual nature of the criticisms used to justify the Complainant's termination.

The Agency's refusal to provide accommodations, training, or performance evaluations constitutes a clear violation of workplace equity and reinforces its discriminatory practices.

**III. DEROGATORY AND DISCRIMINATORY COMMENTS**

On September 29, 2023, while delivering the Complainant's work laptop, the IT Supervisor remarked: "It's the infamous Glenn Federman." Complainant was taken aback and  provided no response.

This unprovoked and derogatory comment, delivered without context or explanation, cast the Complainant in a negative and disparaging light.  The remark underscores the hostile work environment tolerated by the Agency and reflects a pattern of systemic bias.

4

**IV. AGENCY USE OF NEPOTISM TO REPLACE COMPLAINANT**

The Agency openly supports and promotes nepotism. This was stated and encouraged by the human resources manager during initial training for all new employees. Nepotism was the method used to recruit Claimant's replacement. The replacement RN A2 was a 23 yr old female recruited by RN A1 when was working a second full time nursing job at the J County Jail. RN's working at ARC with remote access enabled that to occur.

**V. AGENCY POSITION STATEMENT PG 3 - NURSING SUPERVISOR'S ARBITRARY & CAPRICIOUS 12/12/23 EMAIL**

Complainant denies the veracity of the allegations contained within Respondent's Nursing Supervisor's Arbitrary & Capricious 12/12/23 email

Respondent Nursing Supervisor's email was written on the day Complainant investigated PWS family request of significant weight-loss and 2 days before Complainant's termination meeting. The email was never shown to Complainant while employed nor discussed at the termination meeting. Complainant never had the opportunity to discuss the allegations.

**VI. HOSTILE WORK ENVIRONMENT**

A. Verbal Abuse During Online Training

On December 14, 2023, the Complainant, while working remotely, was called by RN Michelle to attend an "online training session" at the Nurses' Station. Complainant informed the RN that he was working Remotely per Nursing Supervisor, but was told to still come in. Upon arrival, he engaged in conversation with coworker RN's as he attempted to log in and participate. During this time, RN Nora's voice projected over the speaker system, stating:
"Go mute yourself."

The phrasing, perceived by the Complainant as an insult akin to "Go f*** yourself," elicited laughter from other RNs and left the Complainant humiliated. Moments later, the Nursing Supervisor shouted from an adjacent room, summoning the Complainant to a meeting with HR without prior notification. These events, designed to publicly embarrass the Complainant, exemplify the toxic and hostile environment perpetuated by the Agency.

B. Inappropriate and Sexual Conduct

On December 12, 2023, RN A1 engaged in inappropriate behavior by positioning herself provocatively near the Complainant and making demeaning remarks about his competence. Additionally, during a lunch period that month, RNs A1 and A2 engaged in graphic discussions about animal genitalia and made explicit comments about a male coworker. These incidents, ignored by management, contributed to the hostile work environment and reinforced a culture of discrimination and harassment.

5

## C. Harassment Regarding Computer Skills

Although computer proficiency or typing speed was not a stated job requirement, the Complainant was repeatedly mocked and humiliated by coworkers for his slower typing. This ongoing ridicule, compounded by the lack of training or reasonable accommodations, underscored the discriminatory treatment he faced. Despite these challenges, the Complainant demonstrated dedication to his role, actively participating in residence visitations and working closely with Persons We Support (PWS), Resident Managers, and other RNs, as reflected in various Tlogs.

For example, on October 24, 2023, the Complainant collaborated with another RN to provide care advice and develop care plans for PWS, exemplifying his commitment to patient care. Further showcasing his initiative, he created and delivered CPAP training outside of regular hours on December 13, 2023. Remarkably, this effort occurred just one day before his abrupt termination, for which no explanation was provided.

## D. Coordinated Harassment and Retaliation

Pursuant to Respondents' Position Statement,  Complainant alleges that Respondent conspired with certain RNs to spy on him, report minor issues for example being gone for "more than 40 minutes" , and use fabricated or exaggerated claims to justify his termination. These actions were clearly discriminatory, retaliatory, and intended to harm the Complainant's professional and personal standing and continuing set Complainant up to fail

## VII. RETALIATION FOR PROTECTED ACTIVITY

## A. Termination Following Patient Advocacy

On December 12, 2023, the Complainant raised critical concerns regarding:

1. Significant weight loss in a PWS: The Complainant received an email from a family member expressing concern about a PWS's health. He promptly responded, conducted a thorough investigation, and reviewed records to address the family's concerns.

2. Medication shortages: The Complainant reported ongoing shortages that posed direct risks to patient care.

Rather than addressing these concerns, the Agency terminated the Complainant the following day. This retaliatory termination constitutes a violation of protections under Sumner v. U.S. Postal Serv., 899 F.2d 203 (2d Cir. 1990), which prohibits adverse actions against employees engaging in protected activities.

## B. Punitive Workload Manipulation

The Complainant's workload was arbitrarily increased without explanation, creating a stressful and inequitable environment designed to set him up for failure. This tactic reflects retaliatory behavior aimed at undermining the Complainant's performance (Sanderson v. NY State Elec. & Gas Corp., 560 F. App'x 88 (2d Cir. 2014)).

## VIII. UNIQUE WORK HISTORY

A. Extended Period of Disability

The Complainant's resume and job application explicitly disclosed an extended period of more than a decade with no gainful employment due to severe disabilities, including:

1. Polymyalgia Rheumatica (PMR): A debilitating autoimmune condition causing chronic pain and limited mobility.

2. Erosive Inflammatory Arthritis: Resulting in significant joint deformity and the necessity for bilateral index finger PIP joint replacement surgery.

3. Congestive Heart Failure (CHF): Requiring ongoing self-care management and medical monitoring.

During this time, the Complainant:

Provided extensive end-of-life care for his terminally ill mother.

Managed his own daily care with unwavering determination, despite his physical limitations.

B. Full Disclosure During Hiring

The Complainant was transparent during the interview process, discussing his work history and physical limitations. The Nursing Supervisor acknowledged and accepted these disclosures, offering employment based on the Complainant's caregiving experience and demonstrated resilience.

C. Disregard for Work History

The Agency's subsequent attempt to mischaracterize the Complainant's lack of recent professional nursing experience as a justification for termination is baseless. His work history, rooted in caregiving and self-management, directly aligned with the skills required for the position. The Agency's actions constitute unlawful discrimination, as outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

**IX. MISREPRESENTATION OF QUALIFICATIONS**

The Agency falsely misrepresented the Complainant's qualifications as a pretext for termination.

1. Transparent Disclosure During Hiring:
The Complainant's resume explicitly noted the absence of professional nursing experience but emphasized significant caregiving experience, including:

End-of-life care for his terminally ill mother.

Managing self-care for disabilities, including polymyalgia rheumatica (PMR), erosive inflammatory arthritis, and CHF.

2. Recognition of Qualifications by Nursing Supervisor:
During the hiring process, the Nursing Supervisor reviewed the Complainant's application, acknowledged his limitations (e.g., recent bilateral index finger PIP joint replacement surgery), and extended an offer of employment.

3. Mischaracterization as Pretext:
The Agency's attempt to misrepresent the Complainant's caregiving experience as inadequate is baseless and contradicted by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), which prohibits discrimination through pretextual justifications.

**X. SIGNIFICANT WEIGHT LOSS IN A PWS: EVIDENCE OF RETALIATION**

On December 12, 2023, the Complainant commenced a preliminary investigation of concerns raised by a family member about significant weight loss in a PWS. The Complainant:

1. Reviewed Paper Records:
The Complainant visited the residence and reviewed the PWS's weight-loss paper chart, which detailed alarming weight trends. Date and time documentation confirm this investigation. Complainant documented his findings in THERAP.

2. Raised Concerns with the Residence Manager:
The Complainant presented his unfavorable initial findings with the Residence Manager who acknowledged the findings and concerns but offered no further in-depth discussion to help resolve the concerns. It was clear the Residence Manager was not interested in pursuing this investigation any further and Complainant would be investigating on his own.

Complainant was aware the PWS was on portion control and during a recent meeting at the residence, recalled seeing the PWS consistently trying to go to the kitchen to get something to eat but was rebuffed by Resident Manager.

8

Complainant was concerned that the PWS health and well being might be negatively affected and planned to continue the investigation to verify and produce a complete report.
This never occurred since Complainant was terminated 2 days later without discussion,

3. Retaliatory Email from Nursing Supervisor:
That evening, the Nursing Supervisor authored an email criticizing the Complainant, which later served as the basis for his termination. The timing and content of the email reflect the Agency's intent to suppress further investigation into this issue.

4. The "Smoking Gun":
Upon reviewing the Nursing Supervisor's December 12, 2023 email sent at 8:14 PM, the Complainant identified clear evidence of the Agency's retaliatory motive against him. This email underscores the malicious intent to terminate the Complainant as retaliation for exposing unfavorable findings.

### XI. Unlawful, Retaliatory,Termination Rooted In Systemic Discrimination.

- The Agency's actions demonstrate a pattern of suppression, exemplified by the December 12, 2023, email from the Nursing Supervisor.
- This email, sent just hours after the Complainant documented his investigation into weight-loss concerns, represents a clear attempt to discredit and ultimately terminate him in retaliation for his efforts.
- This communication serves as compelling evidence—a proverbial "smoking gun"—highlighting the retaliatory nature of the Agency's actions.

### XII. Favorable SCR Report

Complainant's employment was contingent upon obtaining a favorable Statewide Central Register (SCR) clearance, which was officially approved on an unknown date as human resources refused to provide this information upon termination. Despite this clearance confirming Complainant's eligibility for the position, Respondent unjustifiably delayed granting necessary accommodations and remote access essential for performing critical job functions. These unwarranted obstructions directly hindered Complainant's ability to fulfill his professional responsibilities.

### XIII. Personnel Review and Communications

The SCR Report was promptly reviewed and confirmed by unknown personnel, affirming Complainant's full eligibility for employment. Any subsequent delays, restrictions, or failure to provide required resources were baseless and lacked any legitimate justification. These actions reflect a deliberate and discriminatory intent, undermining Complainant's position and creating unnecessary barriers to his success in the workplace.

### XIV.    EEOC Preservation of Electronically Stored Information

In light of the pending EEOC investigation, the Agency is under a legal obligation to preserve all electronically stored information (ESI) relevant to this case. This obligation includes, but is not limited to, emails, digital communications, HR records, and performance evaluations pertinent to the allegations outlined in this rebuttal. Any failure to preserve such evidence could result in sanctions for spoliation.

The Complainant respectfully requests that the EEOC remind the respondent of its preservation obligations to ensure that all relevant records are safeguarded and not altered, deleted, or destroyed during the investigation or potential litigation.

### XV. REQUESTS FOR DOCUMENTATION

Complainant requests the following:
1. Personnel Records:
Copies of the Complainant's application, resume, and onboarding evaluations.

2. Training Records:
Documentation of training provided to RNs, including the Complainant.

3. THERAP Records:
All Complainant's THERAP records from 8/27/23 - 12/14/23  and PWS weight-loss charts reviewed during the investigation.

4. Performance Evaluations:
All performance reviews, disciplinary records, and related documentation for the Complainant.

### 5. Internal Communications Regarding Accommodation Requests:

- Copies of all internal communications, including but not limited to emails, text messages, meeting notes, and memos, related to:

  - Complainant's requests for accommodations.
  - Requests for accommodations submitted by female registered nurses (RNs).
  - The review, consideration, and approval or denial of these requests for both Complainant and female RNs.

### 6. Policies and Procedures for Reasonable Accommodations:

- A complete and up-to-date copy of all policies, procedures, guidelines, or protocols governing the handling of reasonable accommodation requests, including:

  - Processes for submitting and reviewing accommodation requests.

10

- Criteria used to evaluate and approve or deny requests.
- Documentation and communication requirements for Respondent personnel regarding accommodation requests.

**7. Female RNs' Accommodation Requests:**

- Detailed records of all accommodation requests submitted by female RNs, including:

  - The nature of the accommodations requested.
  - Dates and times the requests were submitted, approved, or denied.
  - Dates and frequency of use for any approved accommodations, such as remote access or flexible scheduling.

These requests aim to evaluate whether established accommodation processes were applied consistently and equitably to both Complainant and female RNs, ensuring fairness and adherence to organizational policies.

**8. Request for Comprehensive Records of Accommodations**

Complainant requests detailed and complete records of accommodations provided to all female registered nurses (RNs). This includes, but is not limited to:

- **Remote Access:**
  - Dates on which remote access was granted.
  - Frequency of use of remote access privileges.
  - Specific dates when remote access was utilized.

These records are essential to assess the equitable application of workplace accommodations and to identify any potential disparities in treatment or access between employees.

Comprehensive records of accommodations provided to each female RNs, including but not limited to remote access -  dates obtained, frequency of use, dates used .

**9. Complainant's SCR Report and Clearance Documentation:**
- A complete copy of Complainant's Statewide Central Register (SCR) Report, along with all related clearance documentation confirming eligibility for employment.

**10. Reviewing Personnel Details for Complainant's SCR Report:**
- The names, titles, and roles of all personnel involved in the review and approval of Complainant's SCR Report and related clearance documentation.

**11. Female RNs' SCR Reports and Clearance Documentation:**
- A copy of the SCR Reports and all related clearance documentation for each female registered nurse (RN) employed by Respondent.

**Reviewing Personnel Details for Female RNs' SCR Reports:**
The names, titles, and roles of all personnel involved in the review and approval of the SCR Reports and related clearance documentation for the female RNs.

11

These requests aim to ensure transparency and consistency in the application of SCR-related processes and to evaluate whether any discrepancies or discriminatory practices occurred in their administration.

**Request for Communications**

Complainant requests a complete and comprehensive copy of all communications, including but not limited to emails, text messages, letters, and phone records, discussing Complainant in any capacity, exchanged between or among the following parties:

**12. Internal Communications:**

- Any Respondent employee with another Respondent employee.
- Respondent employees with Respondent's agency board of directors.

**13. External Communications:**

- Respondent employees or representatives with any captioned defendants and their attorneys in Index Nos,: EF2019-00001146,EF2021-00002391.
- Respondent employees or representatives with officials or representatives from school districts, municipalities, civic leaders, state agencies, court personnel, or law enforcement.

This request encompasses all records, regardless of format or medium, that pertain to discussions, references, or actions involving the Complainant. It seeks to ensure transparency and accountability in matters directly impacting Complainant's rights and interests.


**XVI. RELIEF REQUESTED**

The Complainant respectfully requests that the EEOC:

1. Investigate the Agency's discriminatory practices, hostile work environment, and retaliatory actions.

2. Ensure the preservation of all electronically stored information (ESI).

3. Provide remedies, including compensation for damages and assurances against future violations.


**XVII. CONCLUSION**

The Complainant's experience highlights the Agency's systemic failure to provide accommodations, training, or performance evaluations. These failures, coupled with retaliatory actions and a hostile work environment, underscore the unlawful conduct by the Agency. The EEOC is urged to hold the Agency accountable and ensure justice for the Complainant.

# EEOC REBUTTAL EXHIBITS

15.   **Exhibit A**



*Left Index Finger*



*Right Index Finger*



*Right Index Finger*



*Left Hand*



*Right Hand*

13

# Exhibit B

**6 in Laptop Dell 5520**
**Received September 29, 2024 from IT**
*Search on screen is for COVID Symptoms*

**NOTICE THE EXTREMELY SMALL KEYBOARD**



# Exhibit C

## RESPONDENT FAILED TO PROVIDE COMPLAINANT LARGE KEYBOARD ACCOMMODATION

- ON OR ABOUT OCTOBER 11, 2023 COMPLAINANT WAS INITIALLY APPROVED BY DIRECTOR OF NURSING SERVICES FOR  ACCOMMODATION OF A LARGER KEYBOARD BUT NEVER RECEIVED THE LARGER KEYBOARD

- AFTER RECEIVING LAPTOP COMPUTER ON SEPTEMBER 29, 2023, COMPLAINANT PERSONALLY MET WITH DIRECTOR OF NURSING SERVICES AT HER OFFICE AND REQUESTED A LARGER STANDARD KEYBOARD TO USE WITH THE LAPTOP DUE TO COMPLAINANT'S LARGE ARTHRITIC HANDS.

- DIRECTOR OF NURSING SERVICES  STATED HER APPROVAL FOR COMPLAINANT REQUEST AND STATED SHE WOULD CONTACT IT SUPERVISION TO ARRANGE FOR THE LARGER KEYBOARD.

- DESPITE A NUMBER OF FOLLOWUP REQUESTS TO DIRECTOR OF NURSING SERVICES A LARGER KEYBOARD WAS NOT PROVIDED TO COMPLAINANT

# Exhibit D

## FEMALE RN'S RECEIVED PREFERENTIAL TREATMENT FOR REMOTE COMPUTER ACCESS

- RESPONDENT FAILED TO PROVIDE COMPLAINANT THE SAME REMOTE COMPUTER ACCESS THAT FEMALE RN'S RECEIVED WHEN THEIR WORK LAPTOP COMPUTER WAS PROVIDED

- PURSUANT TO NURSING SUPERVISOR OCTOBER 19, 2023 TEXT MESSAGE ALL NEW RN's WERE IMMEDIATELY PROVIDED WITH REMOTE COMPUTER ACCESS WHEN THEY RECEIVED THEIR COMPUTER AND SHE THINKS SE MESSED UP THE IT REQUEST WHEN COMPLAINANT STARTED. SHE THOUGHT SHE REQUESTED REMOTE ACCESS AND THAT ALL RNS HAVE IT…



- COMPLAINANT WAS NOT PROVIDED WITH REMOTE COMPUTER ACCESS UNTIL OCTOBER 20, 2023 WHICH WAS ALMOST A MONTH  AFTER RECEIVING THE COMPUTER

- COMPLAINANT'S HEALTH WAS ONE REASON WORKING REMOTELY WAS IMPORTANT FOR Complainant DUE TO ASSOCIATED FLUID BUILDUP IN LEGS WHICH OCCURRED WHILE Complainant WAS SITTING AND WORKING AT THE NURSES STATION WITH LOW DESKTOP.

- IF COMPLAINANT WAS IMMEDIATELY PROVIDED REMOTE ACCESS LIKE ALL OTHER RN'S,  Complainant WOULD NOT HAVE HAD EXCESS FLUID BUILDUP IN LEGS WHICH REQUIRED MULTIPLE TRIPS TO THE BATHROOM TO RELEASE EXCESS FLUID.
- DIRECTOR OF NURSING SERVICES AND NURSING SUPERVISOR FAILED TO ACCOMMODATE DESPITE KNOWING COMPLAINANT'S HEALTH ISSUES WHICH WERE DISCUSSED DURING THE INTERVIEW.
- DIRECTOR OF NURSING SERVICES AND NURSING SUPERVISOR FAILED TO ACCOMMODATE BY PROVIDING IMMEDIATE REMOTE ACCESS LIKE ALL FEMALE RNS HAD. THIS FAILURE  DELIBERATELY PREVENTED COMPLAINANT FROM WORKING REMOTELY FOR ALMOST A MONTH, WHICH CAUSED UNNECESSARY HEALTH COMPLICATIONS.

- COMPLAINANTWAS INTENTIONALLY DENIED THE OPPORTUNITY TO WORK REMOTELY AND TREATED DIFFERENTLY THAN ALL OTHER RN's WHO WERE FEMALE

# Exhibit E

**EXAMPLE OF COMPLAINANT'S  18 WEEKLY NOTES FOR PWS ENTERED IN THERAP ON 12/8/23 WITH ACTUAL PWS INFORMATION OMITTED**

Reviewed Notes, MAR and logs  from *Date -Date  PWS* has  been doing well with new equipment. Lab work on *Date* results imputed. Weight consistent with range from 199.2 - 199.5. Last BM  on *Date*.  Total daily fluid intake range from 1700 ml to 1960 ml.
No acute medical concerns at this time.  Documentation complete.
Next appt:  Date   Time  Location
Future PCP  appt:  Date   Time  Location

16

# EXHIBIT F

# CPAP  Care Plan and Training Developed and Implemented by Complainant for CR7



CPAP TRAINING FOR CR7 WITH SIGN IN SHEET

Apnea is when a person stops breathing repeatedly during sleep. Breathing stops because the airway collapses and prevents air from getting into the lungs. Sleep patterns are disrupted, resulting in excessive sleepiness or fatigue during the day. People with sleep apnea are at  increased risk for:  High blood pressure, stroke, decreased quality of life, heart disease and heart attack.

Obstructive sleep apnea is the most common sleep-related breathing disorder. People with obstructive sleep apnea repeatedly stop and start breathing while they sleep.

17

Obstructive sleep apnea occurs when the throat muscles relax and block the airway. This happens off and on many times during sleep. A sign of obstructive sleep apnea is snoring. One treatment for obstructive sleep apnea is a device that uses positive pressure to keep the airway open during sleep.

Episodes of decreased breathing usually last 20 to 40 seconds. People with OSA rarely are aware of having any difficulty breathing, even upon awakening. In adults, OSA is most typically related to obesity. The most common symptoms are loud snoring, unexplained daytime sleepiness, and restless sleep. Other symptoms can include morning headaches, insomnia, mood changes, forgetfulness, unexplained weight gain, and heavy night sweats. The most common and effective intervention used is a CPAP (continuous positive airway pressure). This is a mask that covers the nose, mouth, or both, and applies extra pressure, holding open the relaxed muscles, keeping the airway open.

## CPAP TRAINING SIGN IN SHEET FOR CR7

### Goal(s)

Staff will understand diagnosis and treatment interventions.

Staff will:Demonstrate understanding of CPAP machine use and maintenance.

Staff will monitor and report changes as listed below.

Observe the person for any of the following:

- Increased sleepiness or lethargy during the daytime hours
- new complaints of headaches in the mornings
- changes in breathing when sleeping, especially snoring or periods of not breathing
- Changes in sleep patterns
- Increases in blood pressure from baseline
- Increase irritability

Document any of the above in t logs and notify nursing of any problems

I received CPAP training on _____ and acknowledge understanding of the information presented by my signature below.

_____

_____

Training provided by _____

Glenn Federman RN                 Date_____

18

*EXHIBIT J*

From: Nickel, Joanna C. <jcnickel@thearcjslc.org>
Sent: Tuesday, December 12, 2023 8:14:01 PM
To: McGrath, Laurie L. <llmcgrath@thearcjslc.org>; Peck, Victoria M. <vmpeck@thearcjslc.org>
Subject: GF request for termination

I know I've talked with you both throughout the day about the concerns with Glenn Federman RN. Laurie and I agreed that termination is probably the best course of action here. It took me some time to properly articulate the concerns. Here's a summary -

- Today staff called me before noon to report they had received a medication change for a PWS. They were on a 30 mg tab that was unavailable from the pharmacy but had received a 20 mg tab and a 10 mg to substitute. This has been an ongoing issue for several months. Glenn sent a long email the previous day about exploring options at different pharmacies and such. Laurie said she would discuss this with him when she returned. I advised the staff to send the paperwork to me and I would forward it to Glenn so he could update the MAR. The long and the short of it is, he went to the house to discuss it with the staff. He didn't sign in or out of PayCom to travel fm home to the site. He also did not sign in and out of the visitors log. He updated the MAR at 1045A but just duplicated the 30 mg tab. I contacted him to ask about it and he told me it was a tapering dose. I contacted the RM Lisa Jarvis and this was incorrect. It was supposed to be a 20 mg and a 10 mg tab. I talked with him about it around 3P. He called me at 430P to ask about how to fix it on the MAR. At the present time the MAR is still not

1

corrected. I advised the staff to do paper documentation, so the medication could be given. This very simple task ended up being an all day ordeal and is still not corrected.
- Glenn does not accept guidance and direction from other staff including me. I had directed him to attend 2 meetings at the site he is assigned to so he could meet the teams and visit the site. He chose to visit another PWS in the hospital. The meetings seemed more important since they only occur 2x a year. He also had a lengthy discussion with Arlandy when she was helping him update a plan of nursing service. Several of the staff that were present in the office that day stated it got kind of heated.
- Computer skills are severely lacking which leads to simple tasks taking an extended period of time. I don't believe he can complete his assigned duties in 40 hrs per wk. He has clocked overtime without approval since he started but it has been to the tune of 5 or more hours per wk for 3 of the last 4 wks.
- No established routine after being here nearly 3 months. Time mgmt skills are lacking.
  - He has not completed weekly visits and apparently did not know they were required even though I went over this on day 1 and nearly every week since he's been here.
  - Monthly MAR review has only been done on 2 PWS since he started. October MAR reviews were not done. I showed him how to do this.
  - Has not checked his emails. This resulted in him missing several meetings that he was needed at. One of the RNs showed him how to check the emails after missing a CSP meeting and at that time he had 117 emails. Apparently this did not improve because another RN showed him again and there were over 200 emails that were not read.
- Does not help answer phones or pass medications when in the office
- Clinical skills may also be lacking
  - COVID tested a PWS. After it was negative, he sent them on their way without advising further or having the PWS wear a mask
  - One of the RNs guided him into passing meds to ease him into it and he failed to wash his hands and handled the medications without gloves. Not a good role model for showing others how to do this.
- Disappears throughout the day. Sometimes for more than 40 minutes at a time.
- Takes personal calls in the office on speaker phone and disrupts the work environment

I do have to say he is generally pleasant and always says what a good thing we do here. He compliments the nursing staff on doing a good job often. But I don't think he is a good fit for the position. Thanks for helping us out with this. If you need anything further from me, let me know.

Joanna Nickel RN
Supervisor of Nursing Services

*Exhibit K*



**The Arc.**
Jefferson – St. Lawrence
New York

Achieve with us.

December 14, 2023

Mr. Glenn Federman
17254 Miller Road
Adams, NY 13605

Dear Mr. Federman

Your employment with The Arc Jefferson – St. Lawrence began on September 27, 2023, and until the completion of 90 days, you are in a probationary status. The purpose of this is to give both parties the opportunity to identify if the employment decision was favorable and mutually beneficial.

We do not believe it is in The Arc Jefferson – St. Lawrence' best interest to continue the employment relationship. Effective today, December 14, 2023, we will be ending your employment under Policy #315 II, No fault termination.

You are to turn in all Agency property including ID, fob and parking tag. Your final check will be mailed to the address on file on the next payday. If you have direct deposit, the final check would be deposited into your account. You were not employed long enough to be eligible for any benefits. You are prohibited from contacting the staff or persons supported.

Please feel free to contact me at (315) 836-1256 with any additional questions.

Sincerely,



Victoria M Peck
Regional HR Manager





 Gmail          $\mathcal{E} \times H F B I T$  $L$          Glenn Federman <glennfederman@gmail.com>

## Complainant Response to Respondent Position statement

1 message

**Glenn Federman** <glennfederman@gmail.com>                    Sat, Jan 4, 2025 at 6:54 AM
To: KIMBERLY NEWHARD <KIMBERLY.NEWHARD@eeoc.gov>

Dear Investigator Kimberly Newhard,

Please see attached my Complainant Response to Respondent Position statement

What happened? I just attempted to upload my fully comprehensive written Complainant Response to Respondent Position statement rebuttal (18 pages including Exhibits)  to the Respondent's Position Statement via EEOC Portal but was unable to. To my chagrin, at 6am this morning, I noticed another email which apparently closed the case, which I contend was quite premature due to the extra 1 time 2 week extension you authorized in conjunction to our previous phone conversation, in which you agreed to wait for my written response. I specifically stated I did not want to have the verbal conversation be used instead of my written response and you agreed. I assume you clearly remember our last conversation when I told you I was working very hard on it and I had just finished it at 2am. I put numerous hours into my response and I don't understand what happened.

Therefore, in all fairness, please reopen the EEOC portal and allow me to upload my Complainant Response to Respondent Position statement and base your decision on that. Given the circumstances I believe this a reasonable request.

Thank you for your assistance.

Sincerely,

Glenn Federman
Claimant Pro Se

---

📄 **1_4_25 Complainant Rebuttal Response to Respondent Position Statement .pdf**
1955K

*Exhibit L*

Request for Reconsideration                                    January 7, 2025

Glenn Federman
17254 Miller Rd
Adams, NY 13605
35 586 3382
glennfederman@gmail.com

Equal Employment Opportunity Commission
Olympic Towers
300 Pear St., Suite 450
Buffalo, NY 14202

Subject: Request for Reconsideration of Case No.525-2024-01881

Dear Investigator Kimberely Newhard,

I am writing to formally request reconsideration of the decision in my case No.525-2024-01881, which was closed on January 2, 2025, and a "Right to Sue" letter was issued.

I was not afforded the opportunity to submit my written rebuttal to the allegations made by my employer before the case was closed, even though on December 16, 2024 Investigator Newhard emailed me a one time 2 week extension expiring on January 13, 2025.  Despite my efforts to reach out to Investigator Newhard regarding my written rebuttal via email and phone on 12/30/24, 1/4/25 and 1/6/25, I received no response until late afternoon on 1/6/25. On 1/4/25 the EEOC portal did not  allow me to upload the rebuttal or any other documents and remains closed. In late afternoon on 1/6/25, Investigator Newhard did state in her reply email that the written rebuttal I had emailed her on 1/4/25 was received and reviewed but no statement was made regarding reconsideration of the decision. I did notice Investigator Newhard had proactively entered the written rebuttal as part of my file. Investigator Newhard also provided information regarding FOIL to obtain all the records uploaded in my case.

The information in my written rebuttal is critical to demonstrating the discrimination I experienced. I respectfully request that my case be reopened and reconsidered, allowing me to upload any other supporting documentation until the given deadline of 1/13/25. As the written rebuttal was already received, reviewed and loaded into my file, I did not enclose another copy with this request.

I believe reconsideration is warranted to ensure a fair and thorough investigation. If you require further information or documentation, please do not hesitate to contact me at 315 586-3382 or glennfederman@gmail.com.

Thank you for your attention to this matter. I look forward to your response.
Sincerely,
Glenn Federman

1

 Gmail

*Exhibit L*

Glenn Federman <glennfederman@gmail.com>

## 2025-1-8 CP Reconsideration 525-2024-01881

2 messages

**KIMBERLY NEWHARD** <KIMBERLY.NEWHARD@eeoc.gov>            Fri, Jan 10, 2025 at 7:44 AM
To: Glenn Federman <glennfederman@gmail.com>

Good morning Glenn,
Your reconsideration email was received on January 7, 2025. Your reconsideration email was forwarded to the Director on January 7, 2025. Your reconsideration email was uploaded into your case on January 7, 2025.

The Document title for your reconsideration request is:
2025-01-07 0759 CP reconsideration request 525-2024-01881.msg

Thanks,

Kimberly Newhard
Federal Investigator
US Equal Employment Opportunity Commission Olympic Towers
300 Pearl St., Suite 450
Buffalo, NY 14202

kimberly.newhard@eeoc.gov
Phone: (716) 431-5022
Main: (716) 431-5007
Fax: Bufffaxmain@eeoc.gov



Complete an EEOC online inquiry and schedule an appointment at: https://publicportal.eeoc.gov/Portal/Login.aspx
You can check the status of your EEOC charge by visiting: https://publicportal.eeoc.gov/portal/EEOC/CheckChargeStatusIMS.aspx
Log into your EEOC account online at: https://publicportal.eeoc.gov/portal/SignIn.aspx?From=Home

**NOTE: WE ARE 100% PAPERLESS. You must upload All documents to the Portal**
Parties will obtain status checks, upload and view documents via our portals:
**Charging Parties:**
https://publicportal.eeoc.gov
**Respondents:**
https://nxg.eeoc.gov/rsp/login.jsf

**For assistance with the portals:**
digitalsupport@eeoc.gov
800.569.7118



*CONFIDENTIALITY NOTICE:*
*This email message and any attachments are confidential and intended solely for the named addressee(s).*
*They may be subject to legal, professional or other privilege or may be protected by other legal rules. They*
*must not be disclosed to anyone without the sender's authorization. If you are not the intended recipient or*
*authorized to receive this email for the intended recipient, you may not disclose, copy, distribute or retain*
*this message or any part of it. We would appreciate it if you would notify us if you received this message but*
*were not the intended recipient.*

---

**From:** Glenn Federman <glennfederman@gmail.com>
**Sent:** Wednesday, January 8, 2025 6:18 PM
**To:** KIMBERLY NEWHARD <KIMBERLY.NEWHARD@EEOC.GOV>
**Subject:** Re: 2025-1-6 CP Freedom of Information Act information 525-2024-01881

Hello Kimberly,
Please verify that the Formal Request for reconsideration of Case No.525-2024-0188 was received and uploaded on the Portal. As of the time of this email it has not been uploaded.
Thank you,
Glenn Federman

On Tue, Jan 7, 2025 at 7:58 AM Glenn Federman <glennfederman@gmail.com> wrote:
Formal Request for reconsideration of Case No.525-2024-0188
Please see attached letter.
Thank you,
Glenn Federman

On Mon, Jan 6, 2025 at 5:14 PM KIMBERLY NEWHARD <KIMBERLY.NEWHARD@eeoc.gov> wrote:
Good afternoon Glenn,
Your rebuttal has been received and reviewed.

With regard to your request for information, I have copied and pasted what you will need to do to submit a FOIA request for case 525-2024-01881.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number to the District 525-2024-01881 Enclosure with EEOC Notice of Closure and Rights (01/22) Director at Yaw Gyebi, Jr., 33 Whitehall St 5th Floor, New York, NY 10004.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number to the District Director at Yaw Gyebi, Jr., 33 Whitehall St 5th Floor, New York, NY 10004. You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC. For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm. For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section 83-disclosure-information-charge-files.

Thanks,

Kimberly Newhard
Federal Investigator
US Equal Employment Opportunity Commission Olympic Towers
300 Pearl St., Suite 450
Buffalo, NY 14202

kimberly.newhard@eeoc.gov
Phone: (716) 431-5022
Main:  (716) 431-5007
Fax: Bufffaxmain@eeoc.gov

*Exhibit L* (handwritten)



Complete an EEOC online inquiry and schedule an appointment at: https://publicportal.eeoc.gov/Portal/Login.aspx
You can check the status of your EEOC charge by visiting: https://publicportal.eeoc.gov/portal/EEOC/CheckChargeStatusIMS.aspx
Log into your EEOC account online at: https://publicportal.eeoc.gov/portal/SignIn.aspx?From=Home

**NOTE:  WE ARE 100% PAPERLESS.   You must upload All documents to the Portal**
Parties will obtain status checks, upload and view documents via our portals:
**Charging Parties:**
https://publicportal.eeoc.gov
**Respondents:**
https://nxg.eeoc.gov/rsp/login.jsf

**For assistance with the portals:**
**digitalsupport@eeoc.gov**
**800.569.7118**

*CONFIDENTIALITY NOTICE:*
*This email message and any attachments are confidential and intended solely for the named addressee(s). They may be subject to legal, professional or other privilege or may be protected by other legal rules. They must not be disclosed to anyone without the sender's authorization. If you are not the intended recipient or authorized to receive this email for the intended recipient, you may not disclose, copy, distribute or retain this message or any part of it. We would appreciate it if you would notify us if you received this message but were not the intended recipient.*

**From:** Glenn Federman <glennfederman@gmail.com>
**Sent:** Saturday, January 4, 2025 6:54 AM
**To:** KIMBERLY NEWHARD <KIMBERLY.NEWHARD@EEOC.GOV>
**Subject:** Complainant Response to Respondent Position statement

**CAUTION:** The sender of this message is external to the EEOC network. Please use care when clicking on links and responding with sensitive information. Forward suspicious emails to phishing@eeoc.gov.

Dear Investigator Kimberly Newhard,

*Exhibit L*

Please see attached my Complainant Response to Respondent Position statement

What happened? I just attempted to upload my fully comprehensive written Complainant Response to Respondent Position statement rebuttal (18 pages including Exhibits)   to the Respondent's Position Statement via EEOC Portal but was unable to. To my chagrin, at 6am this morning, I noticed another email which apparently closed the case, which I contend was quite premature due to the extra 1 time 2 week extension you authorized in conjunction to our previous phone conversation, in which you agreed to wait for my written response. I specifically stated I did not want to have the verbal conversation be used instead of my written response and you agreed. I assume you clearly remember our last conversation when I told you I was working very hard on it and I had just finished it at 2am. I put numerous hours into my response and I don't understand what happened.

Therefore, in all fairness, please reopen the EEOC portal and allow me to upload my Complainant Response to Respondent Position statement and base your decision on that. Given the circumstances I believe this a reasonable request.

Thank you for your assistance.

Sincerely,

Glenn Federman
Claimant Pro Se

---

**Glenn Federman** <glennfederman@gmail.com>                    Fri, Jan 17, 2025 at 10:11 AM
To: KIMBERLY NEWHARD <KIMBERLY.NEWHARD@eeoc.gov>

Hello Kimberly,
I am circling back for a status update on the recosideration email.
Thank you,
Glenn Federman

[Quoted text hidden]



**Outlook-eeoc.png**
37K

 Gmail       *Exhbt L*       Glenn Federman <glennfederman@gmail.com>

## 2025-1-31 CP request for reconsideration 525-2024-01881

1 message

**KIMBERLY NEWHARD** <KIMBERLY.NEWHARD@eeoc.gov>                    Fri, Jan 31, 2025 at 2:59 PM
To: Glenn Federman <glennfederman@gmail.com>

Good afternoon,
The preferred method is in writing via the post, however I know you expressed concerns about the time frame.


Thanks,

Kimberly Newhard
Federal Investigator
US Equal Employment Opportunity Commission Olympic Towers
300 Pearl St., Suite 450
Buffalo, NY 14202

kimberly.newhard@eeoc.gov
Phone: (716) 431-5022
Main:  (716) 431-5007
Fax: Bufffaxmain@eeoc.gov



Complete an EEOC online inquiry and schedule an appointment at: https://publicportal.eeoc.gov/Portal/Login.aspx
You can check the status of your EEOC charge by visiting: https://publicportal.eeoc.gov/portal/EEOC/CheckChargeStatusIMS.aspx
Log into your EEOC account online at: https://publicportal.eeoc.gov/portal/SignIn.aspx?From=Home

**NOTE:  WE ARE 100% PAPERLESS.   You must upload All documents to the Portal**
Parties will obtain status checks, upload and view documents via our portals:
**Charging Parties:**
https://publicportal.eeoc.gov
**Respondents:**
https://nxg.eeoc.gov/rsp/login.jsf

**For assistance with the portals:**
**digitalsupport@eeoc.gov**
**800.569.7118**

*Exhibit L*

*CONFIDENTIALITY NOTICE:*
*This email message and any attachments are confidential and intended solely for the named addressee(s).*
*They may be subject to legal, professional or other privilege or may be protected by other legal rules. They*
*must not be disclosed to anyone without the sender's authorization. If you are not the intended recipient or*
*authorized to receive this email for the intended recipient, you may not disclose, copy, distribute or retain*
*this message or any part of it. We would appreciate it if you would notify us if you received this message but*
*were not the intended recipient.*

---

**From:** Glenn Federman <glennfederman@gmail.com>
**Sent:** Friday, January 31, 2025 2:56 PM
**To:** KIMBERLY NEWHARD <KIMBERLY.NEWHARD@EEOC.GOV>
**Subject:** Re: 2025-1-27 CP request for reconsideration 525-2024-01881

Hello Kimberly,
Can I send the reconsideration information to the Director via email and is that the preferred method.
Thank you for your assistance,
Glenn Federman

On Mon, Jan 27, 2025 at 4:49 PM KIMBERLY NEWHARD <KIMBERLY.NEWHARD@eeoc.gov> wrote:

> Good afternoon Glenn,
>
> Please see below for the Director's contact information.
>
> I had forwarded your request for reconsideration to the Director. Please also submit your request
> in writing to Director Kielt along with any sort of evidence or documentation not previously
> submitted.
>
>
> Maureen C. Kielt, Director
>
> US Equal Employment Opportunity Commission
>
> Olympic Towers
>
> 300 Pearl Street, Suite 450
>
> Buffalo, NY 14202
>
>
> Maureen.kielt@eeoc.gov
>
> Fax: (716) 551-4387
>
>
>
> Thanks,
>
> Kimberly Newhard
>
> Federal Investigator
>
> US Equal Employment Opportunity Commission Olympic Towers

300 Pearl St., Suite 450

Buffalo, NY 14202

*Exhibit L*

kimberly.newhard@eeoc.gov

Phone: (716) 431-5022

Main:  (716) 431-5007

Fax: Bufffaxmain@eeoc.gov

Complete an EEOC online inquiry and schedule an appointment at: https://publicportal.eeoc.gov/Portal/Login.aspx

You can check the status of your EEOC charge by visiting: https://publicportal.eeoc.gov/portal/EEOC/CheckChargeStatusIMS.aspx

Log into your EEOC account online at: https://publicportal.eeoc.gov/portal/SignIn.aspx?From=Home

**NOTE:  WE ARE 100% PAPERLESS.   You must upload All documents to the Portal**

Parties will obtain status checks, upload and view documents via our portals:

**Charging Parties:**

https://publicportal.eeoc.gov

**Respondents:**

https://nxg.eeoc.gov/rsp/login.jsf

**For assistance with the portals:**

**digitalsupport@eeoc.gov**

**800.569.7118**

*CONFIDENTIALITY NOTICE:*

*This email message and any attachments are confidential and intended solely for the named addressee(s). They may be subject to legal, professional or other privilege or may be protected by other legal rules. They must not be disclosed to anyone without the sender's authorization. If you are not the intended recipient or authorized to receive this email for the intended recipient, you may not disclose, copy, distribute or retain this message or any part of it. We would appreciate it if you would notify us if you received this message but were not the intended recipient.*

*Exhibit L*

---

**From:** Glenn Federman <glennfederman@gmail.com>
**Sent:** Friday, January 24, 2025 8:46 PM
**To:** KIMBERLY NEWHARD <KIMBERLY.NEWHARD@EEOC.GOV>
**Subject:** Re: 2025-1-23 CP case closed 525-2024-01881

Dear Kimberly Newhard,

I am writing to follow up on my reconsideration request submitted on 1/7/25, regarding EEOC Charge No. 525-2024-01881. While I understand that the status of the reconsideration decision is under the purview of the EEOC Director, the lack of updates for over two and a half weeks has raised concerns regarding the 90-day filing deadline for federal court.

To ensure compliance with this deadline and to preserve my legal rights, I plan to file a complaint in federal court. However, I want to ensure all procedures related to the reconsideration process are handled appropriately.

To that end, I would appreciate the following:

1. Contact Information for the Director: Please provide the name, title, and contact information for the Director reviewing my reconsideration request so I may directly communicate regarding the status of the decision.

2. Confirmation of Current Case Status: Please confirm whether the case has been reopened, is still under review, or remains closed, as this impacts the status of the dismissal and notice of rights previously issued.

As filing my complaint today is critical to preserving my legal rights, I kindly request an immediate response regarding the above. If necessary, I will proceed with filing my complaint in federal court to ensure compliance with the statutory timeline.

I appreciate your cooperation and attention to this matter. If there are any additional steps or actions required of me, please advise promptly.

Sincerely,

Glenn Federman

On Thu, Jan 23, 2025, 4:38 PM KIMBERLY NEWHARD <KIMBERLY.NEWHARD@eeoc.gov> wrote:

> Good afternoon,
>
> Your reconsideration email was forwarded to the Director on January 7, 2025.
>
> Since your case is closed and this has been forwarded to the Director, you will be receiving information from the Director about your reconsideration request.
>
> Please note, the above update will be the update from now until you receive the Director's reconsideration response (versus being provided multiple email updates).
>
> Thanks,
>
> Kimberly Newhard
>
> Federal Investigator
>
> US Equal Employment Opportunity Commission Olympic Towers

300 Pearl St., Suite 450

Buffalo, NY 14202

*Exhibit L*

kimberly.newhard@eeoc.gov

Phone: (716) 431-5022

Main:  (716) 431-5007

Fax: Bufffaxmain@eeoc.gov

eeoc

Complete an EEOC online inquiry and schedule an appointment at: https://publicportal.eeoc.gov/Portal/Login.aspx

You can check the status of your EEOC charge by visiting: https://publicportal.eeoc.gov/portal/EEOC/CheckChargeStatusIMS.aspx

Log into your EEOC account online at: https://publicportal.eeoc.gov/portal/SignIn.aspx?From=Home

**NOTE:  WE ARE 100% PAPERLESS.   You must upload All documents to the Portal**

Parties will obtain status checks, upload and view documents via our portals:

**Charging Parties:**

https://publicportal.eeoc.gov

**Respondents:**

https://nxg.eeoc.gov/rsp/login.jsf

**For assistance with the portals:**

**digitalsupport@eeoc.gov**

**800.569.7118**

*CONFIDENTIALITY NOTICE:*

*This email message and any attachments are confidential and intended solely for the named addressee(s). They may be subject to legal, professional or other privilege or may be protected by other legal rules. They must not be disclosed to anyone without the sender's authorization. If you are not the intended recipient or authorized to receive this email for the intended recipient, you may not disclose, copy, distribute or retain this message or any part of it. We would appreciate it if you would notify us if you received this message but were not the intended recipient.*

Exhibit M

January 31, 2025

Glenn Federman
17254 Miller Rd
Adams, NY 13605
315 586 3382
glennfederman@gmail.com

*(Sent via email due to time restraints previously stated in correspondence with Inspector Kimberely Newhard)*
Maureen C. Kielt, Director
US Equal Employment Opportunity Commission
Olympic Towers
300 Pearl Street, Suite 450
Buffalo, NY 14202
Maureen.kielt@eeoc.gov
Fax: (716) 551-4387

Subject: Formal Request for Reconsideration of Case No.525-2024-01881 along with additional information (see attached) that was not included in the initial request received on January 7, 2025 by Investigator Kimberely Newhard who uploaded in Complainant's file on January 7, 2025

Dear Director Maureen C. Kielt;

I am writing to formally request reconsideration of the decision in my case No.525-2024-01881. which was closed on January 2, 2025, and a "Right to Sue" letter was issued.

I was not afforded the opportunity to submit my written rebuttal to the allegations made by my employer before the case was closed, even though on December 16, 2024 Investigator Newhard emailed me a one time 2 week extension expiring on January 13, 2025. Despite my efforts to reach out to Investigator Newhard regarding my written rebuttal via email and phone on 12/30/24, 1/4/25 and 1/6/25, I received no response until late afternoon on 1/6/25. On 1/4/25 the EEOC portal did not allow me to upload the rebuttal or any other documents and remains closed. In late afternoon on 1/6/25, Investigator Newhard did state in her reply email that the written rebuttal I had emailed her on 1/4/25 was received and reviewed but no statement was made regarding reconsideration of the decision. I did notice Investigator Newhard had proactively entered the written rebuttal as part of my file. Investigator Newhard also provided information regarding FOIL to obtain all the records uploaded in my case.

The information in my written rebuttal is critical to demonstrating the discrimination I experienced. I respectfully request that my case be reopened and reconsidered, allowing me to upload any other

1

supporting documentation until the given deadline of 1/13/25. Although the written rebuttal was already received, reviewed and loaded into my file, I enclosed another copy with this request.

I believe reconsideration is warranted to ensure a fair and thorough investigation. If you require further information or documentation, please do not hesitate to contact me at 315 586-3382 or glennfederman@gmail.com.

Thank you for your attention to this matter. I look forward to your response.

Sincerely,

Glenn Federman

2

EQUAL OPPORTUNITY EMPLOYMENT COMMISSION
GLENN FEDERMAN

                             Complainant Pro Se

**FOR EEOC DIRECTOR
ADDITIONAL INFORMATION
FOR RECONSIDERATION
COMPLAINANT ADDITIONAL
EEOC REBUTTAL
RESPONSE TO
RESPONDENT'S (AGENCY'S)
EEOC POSITION STATEMENT**
Charge 525-2024-01881

           v.

NYSARC, INC.- JEFFERSON COUNTY CHAPTER
                      Respondent (Agency)

---

**PRELIMINARY STATEMENT**

The Complainant's termination was wrongful, retaliatory, and discriminatory, rooted in the Agency's systemic disregard for its legal obligations to ensure an equitable, supportive, and harassment-free workplace.

The Complainant's wrongful termination occurred 2 days after Complainant's investigation exposed a significant PWS weight-loss issue and raised concerns about the ongoing long term unavailable medication from the pharmacy and 11 days before Complainant's probationary period.

**This rebuttal addresses the misrepresentations, omissions, and discriminatory conduct outlined in the Agency's Position Statement. The Complainant provides substantial evidence demonstrating:**

1. Failure to provide reasonable accommodations in violation of the Americans with Disabilities Act (ADA).

2. Fostering a hostile work environment through discriminatory and retaliatory practices.

3. Retaliation for protected activity, including suppression of an investigation into significant weight loss in a Person We Support (PWS) .

4. Misrepresentation of qualifications as a pretext for termination.

5. Workload manipulation as a pretext for termination

6. Discrimination based on age and gender under the New York State Human Rights Law (NYSHRL) and federal law .

1

7. Failure to provide accommodations or training for alleged typing slowness

8. Failure to conduct a RN performance review with the Complainant.

9. Nepotism was the method the Agency used to recruit Claimant's replacement.

10. Failure to provide Complainant the Nursing Supervisor's 12/14/23 email at the termination meeting which was the actual alleged basis for termination and not Policy# 315 - No Fault Termination that was stated in the meeting.

11. The Complainant's allegations are substantiated by substantial evidence of systemic failures. Complainant's experience highlights the Agency's systemic failure to provide reasonable accommodations, foster a respectful workplace, and comply with anti-discrimination laws.

## I. FAILURE TO PROVIDE REASONABLE ACCOMMODATIONS

During the nursing interview, the Agency acknowledged that the Complainant has two manageable disabilities under the ADA: severe autoimmune inflammatory erosive osteoarthritis in his hands (requiring recent surgery) and severe leg swelling due to Congestive Heart Failure (CHF).

The Complainant was informed that RNs can work remotely several days a week. However, on September 29, 2023, he received a small laptop to use at a low countertop desk at the nurses station, which aggravated his leg swelling. Additionally, the small laptop keyboard posed significant challenges for him due to his arthritic hands, and he found it difficult to use the small desk phone system. He opted to use his cell phone instead, following advice from other RNs. (Exhibit B)

### A. Standard-Sized Keyboard

On or about October 11, 2023, the Complainant verbally requested a standard-sized keyboard from the  Director Of Nursing Services at her office to accommodate his arthritic hands, affected by severe autoimmune inflammatory arthritis and bilateral index finger PIP joint replacement surgery. (Exhibit A) Despite immediate verbal approval from the Director Of Nursing Services, this accommodation was never provided, violating the ADA's mandate to provide reasonable accommodations unless undue hardship is demonstrated (McMillan v. City of New York, 711 F.3d 120 (2d Cir. 2013)).

### B. Remote Work Access

The Complainant also requested remote work access to alleviate leg swelling caused by prolonged sitting, a condition exacerbated by Congestive Heart Failure (CHF). Although remote work was purportedly available for all RNs, the Complainant faced significant delays in receiving access and was granted only limited opportunities thereafter. Meanwhile, younger female RNs

2

received immediate and consistent remote access, further highlighting disparate treatment. (Exhibit D)

C. Unequal Remote Access Work Opportunities

Even after gaining remote access, the Complainant was not allowed the same flexibility as other RNs, who routinely worked remotely to accommodate personal needs or secondary jobs. RN Nora – in a discussion at the nurses' station – stated how easy it was to work at the company, with freedom to work whatever hours they wanted. Despite being denied such flexibility, Complainant was targeted with excessive scrutiny and harassment

D. Disparate Treatment Regarding Remote Work

Text messages from the Nursing Supervisor, dated on or about October 18, 2023 confirm that all registered nurses (RNs) were granted remote access immediately upon onboarding—except for Complainant. This clear instance of unequal treatment highlights the Respondent's failure to provide equitable accommodations. The delayed implementation of Complainant's requested accommodations, despite his documented need and verbal assurances from management, further exacerbates the discriminatory nature of these actions.

Such disparate treatment and unwarranted delays in providing reasonable accommodations are actionable under the **Americans with Disabilities Act (ADA)** as established in *Staron v. McDonald's Corp.*, 51 F.3d 353 (2d Cir. 1995), which emphasizes that employers are required to provide reasonable accommodations to qualified individuals with disabilities unless doing so imposes an undue hardship. Respondent's failure to act promptly and equitably violated Complainant's rights and contributed to a hostile and discriminatory work environment.

E. Spiteful Remote Access Denial

On October 19, 2023, Complainant attempted to log in remotely, hoping to improve his productivity. The Nursing Supervisor admitted failure to provide Complainant the same immediate remote access when he initially received his computer as confirmed by her text messages, reflecting deliberate discrimination. As a result the Complainant was not permitted to work remotely until October 20, 2023, as the Nursing Manager texted him to take the day off and make it a 3 day weekend. These 4 days off negatively affected Complainants desired work output which was undeniably used against him in the form of termination by Nursing Management. (Exhibit D)

**II. FAILED TO PROVIDE TRAINING OR ACCOMMODATIONS FOR ALLEGED TYPING PERFORMANCE**

The Agency frequently criticized the Complainant for alleged slowness in typing, yet failed to provide any training or accommodations to address the issue.

3

A. Lack of Standardized Training

Upon hiring, the Complainant was not provided with any standardized training on essential RN functions, including typing or data entry. Despite the variability in how RNs completed written documentation, the Complainant was singled out and chastised for his performance.

B. Refusal to Provide Typing Training or Accommodations

Despite raising concerns about his physical limitations and the ergonomic challenges of the workstation, the Agency:

1. Failed to offer typing training or skill development programs.

2. Denied ergonomic accommodations, such as a standard-sized keyboard, that would have supported the Complainant's ability to type more efficiently.

3. Refused to engage in an interactive process under the ADA to address typing concerns.

Instead, the Agency allowed younger female RNs to mock and humiliate the Complainant about his typing speed, fostering a hostile and discriminatory work environment.

C. Lack of Performance Reviews

The Agency failed to provide any written performance reviews to the Complainant throughout his employment including at termination meeting. These reviews are critical to addressing and improving any alleged deficiencies in job performance. The absence of such documentation:

1. Deprived the Complainant of an opportunity to address concerns proactively.

2. Reflects a lack of transparency and accountability by the Agency.

3. Highlights the pretextual nature of the criticisms used to justify the Complainant's termination.

The Agency's refusal to provide accommodations, training, or performance evaluations constitutes a clear violation of workplace equity and reinforces its discriminatory practices.

## III. DEROGATORY AND DISCRIMINATORY COMMENTS

On September 29, 2023, while delivering the Complainant's work laptop, the IT Supervisor remarked: "It's the infamous Glenn Federman." Complainant was taken aback and provided no response.

4

This unprovoked and derogatory comment, delivered without context or explanation, cast the Complainant in a negative and disparaging light. The remark underscores the hostile work environment tolerated by the Agency and reflects a pattern of systemic bias.

## IV. AGENCY USE OF NEPOTISM TO REPLACE COMPLAINANT

The Agency openly supports and promotes nepotism. This was stated and encouraged by the human resources manager during initial training for all new employees. Nepotism was the method used to recruit Claimant's replacement. The replacement RN Augistina was a 23 yr old female recruited by RN Arlandy when was working a second full time nursing job at the Jefferson County Jail. RN's working at ARC with remote access and choice of hours allegedly enabled the RN's to have a second full time job if so desired.

## V. AGENCY POSITION STATEMENT PG 3 - NURSING SUPERVISOR'S ARBITRARY & CAPRICIOUS 12/12/23 EMAIL

Complainant denies the veracity of the allegations contained within Respondent's Nursing Supervisor's Arbitrary & Capricious 12/12/23 email

Respondent Nursing Supervisor's email was written on the day Complainant investigated PWS family request of significant weight-loss and 2 days before Complainant's termination meeting. The email was never shown to Complainant while employed nor discussed at the termination meeting. Complainant never had the opportunity to discuss the allegations.

## VI. HOSTILE WORK ENVIRONMENT

A. Verbal Abuse During Online Training

On December 14, 2023, the Complainant, while working remotely, was called by RN Michelle to attend an "online training session" at the Nurses' Station. Complainant informed the RN that he was working Remotely per Nursing Supervisor, but was told to still come in. Upon arrival, he engaged in conversation with coworker RN's as he attempted to log in and participate. During this time, RN Nora's voice projected over the speaker system, stating:
"Go mute yourself."

The phrasing, perceived by the Complainant as an insult akin to "Go f*** yourself," elicited laughter from other RNs and left the Complainant humiliated. Moments later, the Nursing Supervisor shouted from an adjacent room, summoning the Complainant to a meeting with HR without prior notification. These events, designed to publicly embarrass the Complainant, exemplify the toxic and hostile environment perpetuated by the Agency.

B. Inappropriate and Sexual Conduct

On December 12, 2023, RN Arlandy engaged in inappropriate behavior by positioning herself provocatively near the Complainant and making demeaning remarks about his competence.

5

Additionally, during a lunch period that month, RNs Arlandy and Agustina engaged in graphic discussions about animal genitalia and made explicit comments about a male coworker. These incidents, ignored by management, contributed to the hostile work environment and reinforced a culture of discrimination and harassment.

C. Harassment Regarding Computer Skills

Although computer proficiency or typing speed was not a stated job requirement, the Complainant was repeatedly mocked and humiliated by coworkers for his slower typing. This ongoing ridicule, compounded by the lack of training or reasonable accommodations, underscored the discriminatory treatment he faced. Despite these challenges, the Complainant demonstrated dedication to his role, actively participating in residence visitations and working closely with Persons We Support (PWS), Resident Managers, and other RNs, as reflected in various Tlogs.

For example, on October 24, 2023, the Complainant collaborated with another RN to provide care advice and develop care plans for PWS, exemplifying his commitment to patient care. Further showcasing his initiative, he created and delivered CPAP training outside of regular hours on December 13, 2023. Remarkably, this effort occurred just one day before his abrupt termination, for which no explanation was provided.

D. Coordinated Harassment and Retaliation

Pursuant to Respondents' Position Statement, Complainant alleges that Respondent conspired with certain RNs to spy on him, report minor issues for example being gone for "more than 40 minutes" , and use fabricated or exaggerated claims to justify his termination. These actions were clearly discriminatory, retaliatory, and intended to harm the Complainant's professional and personal standing and continuing set Complainant up to fail

## VII. RETALIATION FOR PROTECTED ACTIVITY

A. Termination Following Patient Advocacy

On December 12, 2023, the Complainant raised critical concerns regarding:

1. Significant weight loss in a PWS: The Complainant received an email from a family member expressing concern about a PWS's health. He promptly responded, conducted a thorough investigation, and reviewed records to address the family's concerns.

2. Medication shortages: The Complainant reported ongoing shortages that posed direct risks to patient care.

Rather than addressing these concerns, the Agency terminated the Complainant the following day. This retaliatory termination constitutes a violation of protections under Sumner v. U.S.

6

Postal Serv., 899 F.2d 203 (2d Cir. 1990), which prohibits adverse actions against employees engaging in protected activities.

B. Punitive Workload Manipulation

The Complainant's workload was arbitrarily increased without explanation, creating a stressful and inequitable environment designed to set him up for failure. This tactic reflects retaliatory behavior aimed at undermining the Complainant's performance (Sanderson v. NY State Elec. & Gas Corp., 560 F. App'x 88 (2d Cir. 2014)).

## VIII. UNIQUE WORK HISTORY

A. Extended Period of Disability

The Complainant's resume and job application explicitly disclosed an extended period of more than a decade with no gainful employment due to severe disabilities, including:

1. Polymyalgia Rheumatica (PMR): A debilitating autoimmune condition causing chronic pain and limited mobility.

2. Erosive Inflammatory Arthritis: Resulting in significant joint deformity and the necessity for bilateral index finger PIP joint replacement surgery.

3. Congestive Heart Failure (CHF): Requiring ongoing self-care management and medical monitoring.

During this time, the Complainant:

Provided extensive end-of-life care for his terminally ill mother.

Managed his own daily care with unwavering determination, despite his physical limitations.

B. Full Disclosure During Hiring

The Complainant was transparent during the interview process, discussing his work history and physical limitations. The Nursing Supervisor acknowledged and accepted these disclosures, offering employment based on the Complainant's caregiving experience and demonstrated resilience.

C. Disregard for Work History

The Agency's subsequent attempt to mischaracterize the Complainant's lack of recent professional nursing experience as a justification for termination is baseless. His work history, rooted in caregiving and self-management, directly aligned with the skills required for the

position. The Agency's actions constitute unlawful discrimination, as outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

## IX. MISREPRESENTATION OF QUALIFICATIONS

The Agency falsely misrepresented the Complainant's qualifications as a pretext for termination.

1. Transparent Disclosure During Hiring:
The Complainant's resume explicitly noted the absence of professional nursing experience but emphasized significant caregiving experience, including:

End-of-life care for his terminally ill mother.

Managing self-care for disabilities, including polymyalgia rheumatica (PMR), erosive inflammatory arthritis, and CHF.

2. Recognition of Qualifications by Nursing Supervisor:
During the hiring process, the Nursing Supervisor reviewed the Complainant's application, acknowledged his limitations (e.g., recent bilateral index finger PIP joint replacement surgery), and extended an offer of employment.

3. Mischaracterization as Pretext:
The Agency's attempt to misrepresent the Complainant's caregiving experience as inadequate is baseless and contradicted by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), which prohibits discrimination through pretextual justifications.

## X. SIGNIFICANT WEIGHT LOSS IN A PWS: EVIDENCE OF RETALIATION

On December 12, 2023, the Complainant commenced a preliminary investigation of concerns raised by a family member about significant weight loss in a PWS. The Complainant:

1. Reviewed Paper Records:
The Complainant visited the residence and reviewed the PWS's weight-loss paper chart, which detailed alarming weight trends. Date and time documentation confirm this investigation. Complainant documented his findings in THERAP.

2. Raised Concerns with the Residence Manager:
The Complainant presented  his unfavorable initial findings with the Residence Manager who acknowledged the findings and concerns but offered no further in-depth discussion to help resolve the concerns.  It was clear the Residence Manager was not interested in pursuing this investigation any further and Complainant would be investigating on his own.

8

Complainant was aware the PWS was on portion control and during a recent meeting at the residence, recalled seeing the PWS consistently trying to go to the kitchen to get something to eat but was rebuffed by Resident Manager.

Complainant was concerned that the PWS health and well being might be negatively affected and planned to continue the investigation to verify and produce a complete report.
This never occurred since Complainant was terminated 2 days later without discussion,

3. Retaliatory Email from Nursing Supervisor:
That evening, the Nursing Supervisor authored an email criticizing the Complainant, which later served as the basis for his termination. The timing and content of the email reflect the Agency's intent to suppress further investigation into this issue.

4. The "Smoking Gun":
Upon reviewing the Nursing Supervisor's December 12, 2023 email sent at 8:14 PM, the Complainant identified clear evidence of the Agency's retaliatory motive against him. This email underscores the malicious intent to terminate the Complainant as retaliation for exposing unfavorable findings.

## XI. Unlawful, Retaliatory,Termination Rooted In Systemic Discrimination.

- The Agency's actions demonstrate a pattern of suppression, exemplified by the December 12, 2023, email from the Nursing Supervisor.
- This email, sent just hours after the Complainant documented his investigation into weight-loss concerns, represents a clear attempt to discredit and ultimately terminate him in retaliation for his efforts.
- This communication serves as compelling evidence—a proverbial "smoking gun"—highlighting the retaliatory nature of the Agency's actions.

## XII. Favorable SCR Report

Complainant's employment was contingent upon obtaining a favorable Statewide Central Register (SCR) clearance, which was officially approved on an unknown date as human resources refused to provide this information upon termination. Despite this clearance confirming Complainant's eligibility for the position, Respondent unjustifiably delayed granting necessary accommodations and remote access essential for performing critical job functions. These unwarranted obstructions directly hindered Complainant's ability to fulfill his professional responsibilities.

## XIII. Personnel Review and Communications

The SCR Report was promptly reviewed and confirmed by unknown personnel, affirming Complainant's full eligibility for employment. Any subsequent delays, restrictions, or failure to provide required resources were baseless and lacked any legitimate justification. These actions

9

reflect a deliberate and discriminatory intent, undermining Complainant's position and creating unnecessary barriers to his success in the workplace.

## XIV.    EEOC Preservation of Electronically Stored Information

In light of the pending EEOC investigation, the Agency is under a legal obligation to preserve all electronically stored information (ESI) relevant to this case. This obligation includes, but is not limited to, emails, digital communications, HR records, and performance evaluations pertinent to the allegations outlined in this rebuttal. Any failure to preserve such evidence could result in sanctions for spoliation.

The Complainant respectfully requests that the EEOC remind the respondent of its preservation obligations to ensure that all relevant records are safeguarded and not altered, deleted, or destroyed during the investigation or potential litigation.

## XV. REQUESTS FOR DOCUMENTATION

Complainant requests the following:
1. Personnel Records:
Copies of the Complainant's application, resume, and onboarding evaluations.

2. Training Records:
Documentation of training provided to RNs, including the Complainant.

3. THERAP Records:
All Complainant's THERAP records from 8/27/23 - 12/14/23  and PWS weight-loss charts reviewed during the investigation.

4. Performance Evaluations:
All performance reviews, disciplinary records, and related documentation for the Complainant.

## 5. Internal Communications Regarding Accommodation Requests:

- ○ Copies of all internal communications, including but not limited to emails, text messages, meeting notes, and memos, related to:

    - Complainant's requests for accommodations.
    - Requests for accommodations submitted by female registered nurses (RNs).
    - The review, consideration, and approval or denial of these requests for both Complainant and female RNs.

## 6. Policies and Procedures for Reasonable Accommodations:

10

- A complete and up-to-date copy of all policies, procedures, guidelines, or protocols governing the handling of reasonable accommodation requests, including:

  - Processes for submitting and reviewing accommodation requests.
  - Criteria used to evaluate and approve or deny requests.
  - Documentation and communication requirements for Respondent personnel regarding accommodation requests.

**7. Female RNs' Accommodation Requests:**

- Detailed records of all accommodation requests submitted by female RNs, including:

  - The nature of the accommodations requested.
  - Dates and times the requests were submitted, approved, or denied.
  - Dates and frequency of use for any approved accommodations, such as remote access or flexible scheduling.

These requests aim to evaluate whether established accommodation processes were applied consistently and equitably to both Complainant and female RNs, ensuring fairness and adherence to organizational policies.

**8. Request for Comprehensive Records of Accommodations**

Complainant requests detailed and complete records of accommodations provided to all female registered nurses (RNs). This includes, but is not limited to:

- **Remote Access:**
  - Dates on which remote access was granted.
  - Frequency of use of remote access privileges.
  - Specific dates when remote access was utilized.

These records are essential to assess the equitable application of workplace accommodations and to identify any potential disparities in treatment or access between employees.

Comprehensive records of accommodations provided to each female RNs, including but not limited to remote access - dates obtained, frequency of use, dates used .

**9. Complainant's SCR Report and Clearance Documentation:**
  - A complete copy of Complainant's Statewide Central Register (SCR) Report, along with all related clearance documentation confirming eligibility for employment.

**10. Reviewing Personnel Details for Complainant's SCR Report:**
  - The names, titles, and roles of all personnel involved in the review and approval of Complainant's SCR Report and related clearance documentation.

11

**11. Female RNs' SCR Reports and Clearance Documentation:**

- A copy of the SCR Reports and all related clearance documentation for each female registered nurse (RN) employed by Respondent.
-

**Reviewing Personnel Details for Female RNs' SCR Reports:**

The names, titles, and roles of all personnel involved in the review and approval of the SCR Reports and related clearance documentation for the female RNs.

These requests aim to ensure transparency and consistency in the application of SCR-related processes and to evaluate whether any discrepancies or discriminatory practices occurred in their administration.

**Request for Communications**

Complainant requests a complete and comprehensive copy of all communications, including but not limited to emails, text messages, letters, and phone records, discussing Complainant in any capacity, exchanged between or among the following parties:

**12. Internal Communications:**

- Any Respondent employee with another Respondent employee.
- Respondent employees with Respondent's agency board of directors.

**13. External Communications:**

- Respondent employees or representatives with any captioned defendants and their attorneys in Index Nos,: EF2019-00001146,EF2021-00002391.
- Respondent employees or representatives with officials or representatives from school districts, municipalities, civic leaders, state agencies, court personnel, or law enforcement.

This request encompasses all records, regardless of format or medium, that pertain to discussions, references, or actions involving the Complainant. It seeks to ensure transparency and accountability in matters directly impacting Complainant's rights and interests.

**XVI. RELIEF REQUESTED**

The Complainant respectfully requests that the EEOC:

1. Investigate the Agency's discriminatory practices, hostile work environment, and retaliatory actions.

2. Ensure the preservation of all electronically stored information (ESI).

3. Provide remedies, including compensation for damages and assurances against future violations.

## XVII. CONCLUSION

The Complainant's experience highlights the Agency's systemic failure to provide accommodations, training, or performance evaluations. These failures, coupled with retaliatory actions and a hostile work environment, underscore the unlawful conduct by the Agency. The EEOC is urged to hold the Agency accountable and ensure justice for the Complainant.

Respectfully submitted,

Glenn Federman

13

# EEOC REBUTTAL EXHIBITS

15. **Exhibit A**



*Left Index Finger*



*Right Index Finger*



*Right Index Finger*



*Left Hand*



*Right Hand*

14

# Exhibit B

**Laptop Dell 5520**
**Received September 29, 2024 from IT**
*Search on screen is for COVID Symptoms*

## NOTICE THE EXTREMELY SMALL KEYBOARD



# Exhibit C
## RESPONDENT FAILED TO PROVIDE COMPLAINANT LARGE KEYBOARD ACCOMMODATION

- ON OR ABOUT OCTOBER 11, 2023 COMPLAINANT WAS INITIALLY APPROVED BY DIRECTOR OF NURSING SERVICES FOR ACCOMMODATION OF A LARGER KEYBOARD BUT NEVER RECEIVED THE LARGER KEYBOARD

- AFTER RECEIVING LAPTOP COMPUTER ON SEPTEMBER 29, 2023, COMPLAINANT PERSONALLY MET WITH DIRECTOR OF NURSING SERVICES AT HER OFFICE AND REQUESTED A LARGER STANDARD KEYBOARD TO USE WITH THE LAPTOP DUE TO COMPLAINANT'S LARGE ARTHRITIC HANDS.

- DIRECTOR OF NURSING SERVICES STATED HER APPROVAL FOR COMPLAINANT REQUEST AND STATED SHE WOULD CONTACT IT SUPERVISION TO ARRANGE FOR THE LARGER KEYBOARD.

- DESPITE A NUMBER OF FOLLOWUP REQUESTS TO DIRECTOR OF NURSING SERVICES A LARGER KEYBOARD WAS NOT PROVIDED TO COMPLAINANT

# Exhibit D
## FEMALE RN'S RECEIVED PREFERENTIAL TREATMENT FOR REMOTE COMPUTER ACCESS

- RESPONDENT FAILED TO PROVIDE COMPLAINANT THE SAME REMOTE COMPUTER ACCESS THAT FEMALE RN'S RECEIVED WHEN THEIR WORK LAPTOP COMPUTER WAS PROVIDED

- PURSUANT TO NURSING SUPERVISOR OCTOBER 19, 2023 TEXT MESSAGE ALL NEW RN's WERE IMMEDIATELY PROVIDED WITH REMOTE COMPUTER ACCESS WHEN THEY RECEIVED THEIR COMPUTER AND SHE THINKS SHE MESSED UP THE IT REQUEST WHEN COMPLAINANT STARTED. SHE THOUGHT SHE REQUESTED REMOTE ACCESS AND THAT ALL RNS HAVE IT...



16

- COMPLAINANT WAS NOT PROVIDED WITH REMOTE COMPUTER ACCESS UNTIL OCTOBER 20, 2023 WHICH WAS ALMOST A MONTH  AFTER RECEIVING THE COMPUTER

  - COMPLAINANT'S HEALTH WAS ONE REASON WORKING REMOTELY WAS IMPORTANT FOR Complainant DUE TO ASSOCIATED FLUID BUILDUP IN LEGS WHICH OCCURRED WHILE Complainant WAS SITTING AND WORKING AT THE NURSES STATION WITH LOW DESKTOP.

- IF COMPLAINANT WAS IMMEDIATELY PROVIDED REMOTE ACCESS LIKE ALL OTHER RN'S, Complainant WOULD NOT HAVE HAD EXCESS FLUID BUILDUP IN LEGS WHICH REQUIRED MULTIPLE TRIPS TO THE BATHROOM TO RELEASE EXCESS FLUID.
- DIRECTOR OF NURSING SERVICES AND NURSING SUPERVISOR FAILED TO ACCOMMODATE DESPITE KNOWING COMPLAINANT'S HEALTH ISSUES WHICH WERE DISCUSSED DURING THE INTERVIEW.
- DIRECTOR OF NURSING SERVICES AND NURSING SUPERVISOR FAILED TO ACCOMMODATE BY PROVIDING IMMEDIATE REMOTE ACCESS LIKE ALL FEMALE RNS HAD. THIS FAILURE  DELIBERATELY PREVENTED COMPLAINANT FROM WORKING REMOTELY FOR ALMOST A MONTH, WHICH CAUSED UNNECESSARY HEALTH COMPLICATIONS.

- COMPLAINANTWAS INTENTIONALLY DENIED THE OPPORTUNITY TO WORK REMOTELY AND TREATED DIFFERENTLY THAN ALL OTHER RN's WHO WERE FEMALE

# Exhibit E

**EXAMPLE OF COMPLAINANT'S  18 WEEKLY NOTES FOR PWS ENTERED IN THERAP ON 12/8/23 WITH ACTUAL PWS INFORMATION OMITTED**

Reviewed Notes, MAR and logs  from *Date -Date  PWS* has  been doing well with new equipment. Lab work on *Date* results imputed. Weight consistent with range from 199.2 - 199.5. Last BM  on *Date*.  Total daily fluid intake range from 1700 ml to 1960 ml.
No acute medical concerns at this time.  Documentation complete.
Next appt:  Date  Time  Location
Future PCP  appt:  Date  Time  Location

17

# EXHIBIT F

# CPAP  Care Plan and Training Developed and Implemented by Complainant for CR7



CPAP TRAINING FOR CR7 WITH SIGN IN SHEET

Apnea is when a person stops breathing repeatedly during sleep. Breathing stops because the airway collapses and prevents air from getting into the lungs. Sleep patterns are disrupted, resulting in excessive sleepiness or fatigue during the day. People with sleep apnea are at  increased risk for:  High blood pressure, stroke, decreased quality of life, heart disease and heart attack.

Obstructive sleep apnea is the most common sleep-related breathing disorder. People with obstructive sleep apnea repeatedly stop and start breathing while they sleep.

18

Obstructive sleep apnea occurs when the throat muscles relax and block the airway. This happens off and on many times during sleep. A sign of obstructive sleep apnea is snoring. One treatment for obstructive sleep apnea is a device that uses positive pressure to keep the airway open during sleep.

Episodes of decreased breathing usually last 20 to 40 seconds. People with OSA rarely are aware of having any difficulty breathing, even upon awakening. In adults, OSA is most typically related to obesity. The most common symptoms are loud snoring, unexplained daytime sleepiness, and restless sleep. Other symptoms can include morning headaches, insomnia, mood changes, forgetfulness, unexplained weight gain, and heavy night sweats. The most common and effective intervention used is a CPAP (continuous positive airway pressure). This is a mask that covers the nose, mouth, or both, and applies extra pressure, holding open the relaxed muscles, keeping the airway open.

## CPAP TRAINING SIGN IN SHEET FOR CR7

### Goal(s)

Staff will understand diagnosis and treatment interventions.

Staff will:Demonstrate understanding of CPAP machine use and maintenance.

Staff will monitor and report changes as listed below.

Observe the person for any of the following:

- Increased sleepiness or lethargy during the daytime hours
- new complaints of headaches in the mornings
- changes in breathing when sleeping, especially snoring or periods of not breathing
- Changes in sleep patterns
- Increases in blood pressure from baseline
- Increase irritability

Document any of the above in t logs and notify nursing of any problems

I received CPAP training on _____ and acknowledge understanding of the information presented by my signature below.

_____

_____

Training provided by _____

Glenn Federman RN                Date_____

19

EXHIBIT N

**Glenn Federman**
**Adams, NY 13605**
315-586-3382
glennfederman@gmail.com

**Summary**

Organized and professional Nurse with several years of hands-on experience in a private home care setting providing palliative care and  non palliative care for individuals with and without disabilities. Trained to work with patients of all ages, from pediatric to geriatric. Empathetic bedside manner and strong teamwork skills.

**Education**

| | |
|---|---|
| 2011 | **Associate of Science: Nursing RN** *Excelsior College -  Albany, NY* |
| 2004 | **Ph.D: Education** *Kennedy Western University - Wyoming* |
| 1994 | **Bachelor of Science: Nuclear Technology** *Regents College - Albany, NY* |
| 1982 | **Bachelor of Science: Music** *Regents College - Albany, New York* |

**NURSING EXPERIENCE**

**Private Home Care - Registered Nurse**

March 2019 - Current

- Administered daily medications and provided treatment for multiple arthropathies, - PMR, erosive inflammatory arthritis and osteoarthritis to reduce symptoms and aid in recovery.
- Assisted with physical therapy
- Monitored and charted daily medications, treatments, blood pressure, O2 levels with observation for  adverse medication reactions

June 2018 - February 2019

- Provided quality 24/7  live in palliative care for client which included care for her companion and support dog
- Administered and charted  daily medications and treatments to reduce symptoms and aid in recovery
- Monitored and charted daily medications, treatments, blood pressure, O2 levels, adverse medication reactions
- Scheduled meals, entertainment, activities and social interaction
- Assisted with daily bathing
- Monitored and charted findings related to medication adverse reactions

**PRIOR WORK EXPERIENCE**
**Nuclear  Instructor and Technical Procedure Writer**
**Niagara Mohawk Power Corporation**
8/1984 - 5/2008

The Arc Jefferson - St. Lawrence
Payroll Profile: 0XL11

**Application for Registered Nurse - Jefferson County - 712321**

# Application Information

| | | | |
|---|---|---|---|
| **Name** | Federman, Glenn | **Primary Phone** | +1 (315) 586-3382 [Cell] |
| **Secondary Phone** | (n/a) | **Date of Application** | 08-29-2023 |
| **Application ID** | 712321 | **Applied to** | The Arc Jefferson - St. Lawrence |
| **Email Address** | Glennfederman@gmail.com | **Address** | 17254 Miller Rd |
| **City, State/Province, Zip/Postal Code, Country** | Adams, NY, 13605, USA | **County** | (n/a) |
| **Referral Source** | Newspaper Ad | **Referral Name** | Newzjunky |
| **Driver's License Number** | 762454627 | **Driver's License State** | New York |
| **Driver's License Country** | UNITED STATES | **License Expiration Date** | 03-26-2027 |

# Education

| | | | |
|---|---|---|---|
| **Institution** | Excelsior College,University,Albany, NY, USA | **Institution Phone Number** | (n/a) |
| **Dates Attended** | (n/a) | **Attended As** | (n/a) |
| **Major/Minor** | Nursing RN/None | **Degree** | Associate of Science |
| **GPA** | (n/a) | **Graduated** | Yes |

| | | | |
|---|---|---|---|
| **Institution** | Regents College,University,Albany, NY, USA | **Institution Phone Number** | (n/a) |
| **Dates Attended** | (n/a) | **Attended As** | (n/a) |
| **Major/Minor** | Nuclear Technology/ | **Degree** | Bachelor of Science |
| **GPA** | (n/a) | **Graduated** | Yes |

| | | | |
|---|---|---|---|
| **Institution** | Regents,University,Albany, NY, USA | **Institution Phone Number** | (n/a) |
| **Dates Attended** | (n/a) | **Attended As** | (n/a) |
| **Major/Minor** | Music/ | **Degree** | Bachelors |
| **GPA** | (n/a) | **Graduated** | Yes |

| | | | |
|---|---|---|---|
| **Institution** | Kennedy Western University,Graduate School,Cheyenne, WY, USA | **Institution Phone Number** | (n/a) |

The Arc Jefferson - St. Lawrence
Payroll Profile: 0XL11

**Application for Registered Nurse - Jefferson County - 712321**

| | | | |
|---|---|---|---|
| **Dates Attended** | (n/a) | **Attended As** | (n/a) |
| **Major/Minor** | Education/ | **Degree** | Doctorate |
| **GPA** | (n/a) | **Graduated** | Yes |

# Employment

| | | | |
|---|---|---|---|
| **Employer** | (n/a), (n/a), (n/a) | **Employer Phone Number** | (n/a) |
| **Dates of Employment** | 00/00/0000 To 00/00/0000 | **Job Duties** | (n/a) |
| **Can Contact?** | No | **Reason for Leaving** | (n/a) |
| **Current Employer** | No | | |

# References

# Questions

## Question Group 1

| | |
|---|---|
| Are you eligible to work in the United States? | Yes |

## Question Group 2

| | |
|---|---|
| Are you authorized to work in the United States? | Yes |
| Are you 18 years of age or older? | Yes |
| Have you worked for this agency before? | No |
| If yes, give dates and position held. | |
| What type of employment are you looking for? | Full-Time |
| List the days of the week that you are available. | Saturday; Sunday; Monday - Friday |
| What date would you be available to start employment with us? | 09-20-2023 |
| Do you have a valid Driver License? If so, what State and Class type? | yes / NY / Class |
| Have you ever served in any branch of the United States Military? | Yes |
| If you answered yes to the previous question, which branch you were assigned to? | NAVY |
| Have you EVER been convicted of a misdemeanor or felony in ANY jurisdiction and are there any pending criminal charges against you? | No |

If you answered yes to any of the above questions, please describe in full.

The Arc Jefferson - St. Lawrence
Payroll Profile: 0XL11

**Application for Registered Nurse - Jefferson County - 712321**

| | |
|---|---|
| **Have you EVER been convicted of a motor vehicle moving violation, including, but not limited to alcohol and drug related offenses, any suspension, revocation, or occurrence involving harm to human beings or property while driving?** | No |

**If yes to the above question, please describe.**

| | |
|---|---|
| **Have you received ANY sanction or disciplinary action by any federal or state law enforcement,regulatory or licensing agency or licensing body, including exclusion, suspension, debarment or other ineligibility from the Medicare/Medicaid programs?** | No |
| **Are you able with or without reasonable accommodation, to perform the essential functions of the job for which you are applying?** | Yes |
| **What is your desired rate of pay?** | RN pay scale |

# Statement

# Acknowledged

Yes

# Signature

Glenn Federman [09/03/2023]

*19  3.75*
*12/10  3:50*

## Federman, Glenn

| | |
|---|---|
| **From:** | Nickel, Joanna C. |
| **Sent:** | Friday, December 1, 2023 11:54 AM |
| **To:** | Okeze, Augustina O.; Federman, Glenn |
| **Subject:** | Fwd: New RNs |

Hey Augustina and Glenn,
Every morning you should be reviewing On Call Hub at oncallhub.com to see if any of your folks had something come up after 4p. Once you review the call, you can mark complete.

Your log in info is below. Email or call me with any questions.

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android

---

**From:** McGrath, Laurie L. <llmcgrath@thearcjslc.org>
**Sent:** Friday, December 1, 2023 11:47:39 AM
**To:** Nickel, Joanna C. <jcnickel@thearcjslc.org>
**Subject:** FW: New RNs

**From:** Georgann Purtell <ggpurtell@gmail.com>
**Sent:** Friday, December 1, 2023 11:24 AM
**To:** McGrath, Laurie L. <llmcgrath@thearcjslc.org>
**Cc:** Cheryl Hunt <innovativetriageservices@gmail.com>
**Subject:** Re: New RNs

All set Laurie. Please let me know if you have any issues. Have a great weekend!

Madison deleted.
Username: Email address
Password: Password1@

*Georgann Purtell, BSN,CEO*
*Innovative Triage Services, PLLC*
*ggpurtell@gmail.com*
*315-559-6565*

On Fri, Dec 1, 2023 at 9:02 AM McGrath, Laurie L. <llmcgrath@thearcjslc.org> wrote:

Can I please have access for:
Glenn Federman RN gfederman@thearcjslc.org
Augustina Okeze RN aookeze@thearcjslc.org

1